Elnora G. POPE, Plaintiff–Appellant,

v.

Donna E. SHALALA,* Secretary of Health and Human Services, Defendant–Appellee.

No. 92–1084.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1992.

Decided July 2, 1993.

Rehearing Denied Aug. 30, 1993.

* Donna E. Shalala is substituted for her predecessor, Louis W. Sullivan, as Secretary of Health and Human Services. Fed.R.App.P. 43(c)(1).

Judith M. Haller, Legal Services of Northwest Indiana (argued), Gary, IN, for plaintiff-appellant.

Orest S. Szewciw, Asst. U.S. Atty., Catherine A. Seagle (argued), Dyer, IN, for defendant-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.**

WILL, Senior District Judge.

Elnora Pope filed an application for Supplemental Security Income (SSI) with the Secretary of Health and Human Services (Secretary) pursuant to Title XVI of the Social Security Act (Act), 42 U.S.C. §§ 1382 *et seq.*, alleging disability due to a back impair-

** The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

ment. The Secretary denied her application after an administrative law judge (ALJ) held that, despite her complaints of back pain, she was not disabled and thus not entitled to benefits. Pope appealed the decision and the district court affirmed. We affirm.

## I.

Elnora Pope is currently forty-eight years old and has a high school education plus two years of college. She was employed from 1975–82 as a statistical clerk and a secretary. Her work required her to lift from twenty-five to fifty pounds, which is classified as light to medium levels of lifting. Prior to that she worked as a laborer cleaning ditches, sweeping and shoveling. She has no acquired work skills transferable to skilled or semi-skilled work activities. She alleges that she has been unable to work since she injured her back in April, 1984.

### A. *Procedural Background*

Pope filed this claim for SSI on October 18, 1984. Her application was initially denied, as was her request for reconsideration, and she requested an administrative hearing. Pope was represented by counsel at the subsequent hearing before the ALJ held on April 24, 1985. On June 26, 1985, The ALJ concluded that she was not entitled to benefits. The Appeals Council, however, held that the evidence was inconclusive and remanded the case back to the ALJ to develop the record. The ALJ was instructed specifically to obtain a consultative neurological examination, a medical assessment of the claimant's ability to do work-related activities and records from Pope's June, 1985, hospitalization. On remand, the ALJ again held that the claimant was not entitled to benefits because the evidence indicated that she could perform sedentary work.[1] On May 8, 1987, the Appeals Council upheld the finding of the ALJ, and his ruling became the final decision of the Secretary.

Pope timely filed suit in the district court on July 13, 1987, for judicial review of the Secretary's decision pursuant to 42 U.S.C. § 405(g). On November 4, 1991, the district court denied plaintiff's motion for summary judgment and granted judgment for the Secretary on the ground that the ALJ's decision was based on substantial evidence.

### B. *Statutory and Regulatory Framework*

In order to qualify for SSI benefits, a claimant must be "disabled." The Act defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is further defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(C).

Social Security regulations outline a five-step inquiry to be followed in determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)–(f). The Secretary must determine in sequence: (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing any work in the national economy. *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir.1992). Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.

---

1. Sedentary work is defined as follows:

   Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

   20 C.F.R. § 416.967(a) (1992).

*Rhoderick v. Heckler,* 737 F.2d 714, 715 (7th Cir.1984).

## C. *Evidence Before the ALJ*

At the hearing, Pope testified that after her April, 1984, injury, she suffered from intermittent low back pain. She also stated that she experienced numbness in her legs after sitting or standing for prolonged periods, followed by severe pain and muscle spasms. She testified that she was unable to bend or lift anything and thus could not return to her past work. She spent her days reading, watching television and performing light chores such as cooking. She also readied her children for school and drove for short distances. Pope also noted that she was blind in her right eye since birth.

The medical records produced at the hearing show that Pope was admitted to St. Mary Medical Center on April 12, 1984, where she was diagnosed with severe back pain due to a small herniated disc, degenerative arthritis and a history of asthma. She was treated with anti-inflammatories and analgesics with little relief. X-rays of the lumbosacral spine were negative except for minimal degenerative changes, and x-rays of the hips showed some degenerative changes. A lumbar CT scan showed osteoarthritic changes and arteriosclerosis of the abdominal aorta. A lumbar myelogram revealed a small right lateral herniated disc at L3–L4. An epidural block was performed on April 30, 1984, which resulted in significant relief. A CT scan taken on July 12, 1984, was normal, with no evidence of disc protrusion or stenosis.

Pope was admitted to the Methodist Hospital on September 23, 1984, alleging severe low back pain for the past five months. Upon examination there was right paravertebral muscle spasm. Lasegue's sign[2] was positive bilaterally and there was cross-over pain from left to right. Deep tendon reflexes and motor power were unremarkable. A myelography and CT scan proved negative, with only a mild lateral bulge into the right

at L3/4. Electromyogram and nerve conduction studies showed essentially no abnormality and no strong evidence of disc herniation. She was diagnosed with chronic lumbosacral strain and responded well to conservative treatment.

In his November 15, 1984, report, Dr. Richard Oni found that Pope suffered from recurrent lumbosacral strain and had responded well to an epidural block administered six weeks earlier. There was no evidence of joint abnormality and she retained a full range of motion throughout her joints. Her pain and muscle spasms had resolved. She was advised not to lift more than five pounds or engage in work involving bending or climbing.

On January 2, 1985, Dr. Tony Anigbo reported that EMG evidence indicated that Pope had apparent S1 radiculopathy.[3] The results of the CT scan and a lumbar myelogram had been negative. She had no definite sensory loss, and only minimal reflex loss limited to her right ankle. Her back had allegedly worsened, and her second nerve block injection resulted in only six weeks without pain.

Treating physician Dr. Aghaji reported on January 9, 1985, that Pope had asthmatic bronchitis, allergic rhinitis, a herniated lumbar disc, a small fibroid uterus and status post a hemorrhoidectomy. He stated that her asthma attacks had stopped, and that she had a limited range of motion of her lumbar spine secondary to pain. There was no evidence of motor, sensory or reflex loss, or muscle weakness and she could walk unassisted. Spinal surgery was anticipated, but had not yet been performed.

Pope was admitted to Methodist Hospital on January 11, 1985, where a myelogram of the lumbar spine was negative. She was diagnosed with low back pain and she responded well to conservative treatment. She was readmitted on February 20, 1985, complaining of severe low back pain with radiation to her right leg and difficulty walking.

---

**2.** An indication of a lower back disorder where the flexion of the hip is painful when the knee is extended, but painless when the knee is flexed. Dorland's Illustrated Medical Dictionary 1523 (27th ed. 1988).

**3.** Disease of the nerve roots in the vertebrae of the lower back. Dorland's, *supra,* at 1405, 1831.

Repeated CT scans and x-rays of the lumbosacral spine and a total myelogram indicated only a minimal extradural defect at L4–L5. Back pain was thought to stem from involvement of the right sacroiliac. Her discharge diagnosis was severe radiating pain to the right leg and arthritis of the sacroiliac joint and lumbosacral spine.

Dr. Krishman Potti reported on March 15, 1985, that the claimant had a severe disability involving her leg due to a herniated disc. She had been advised to wear Ted hose in order to preclude the possible development of bloodclots in the pulmonary artery.

In an April, 1985, report, Dr. J.F. Bicalho found that Pope was experiencing pain in her back, right hip and leg due to a small herniated disc in the lumbar region. At that time, she was wearing a corset and undergoing intensive physical therapy. He opined that she was unable to perform any physical activity, including prolonged walking or standing, lifting, housework or any form of work activity.

Upon remand from the Appeals Council, additional evidence was received. Records from Pope's June, 1985, hospitalization indicated that she complained of low back pain radiating down her right leg. She was put into traction and started on an aggressive but carefully designed medication regimen. A chest x-ray of the bones found at the junction of the spinal column and pelvis was negative, as was a CT scan of the pelvis.

A July 9, 1985, report by Dr. Potti stated that she had a severe disability. He described her as bedbound and needing a wheelchair, opining that she was unable to perform any labor or services, and that the impairment would continue throughout her lifetime.

Dr. Bicalho reported that between April and July, 1985, Pope had difficulty walking and that pain radiated to the right leg at all times. Past myelogram and CT scans indicated a herniated disc at L4–L5, although not large enough to require surgery. She had undergone physical therapy with no relief.

The doctor was of the opinion that Pope could not do work that involved walking or standing or sitting for long periods of time.

An EMG study conducted by Dr. Jacqueline Carter on September 27, 1984, was normal except for the failure to obtain an H-reflex on the right side, which is suggestive of an S1 radiculopathy or sciatic lesion.[4] Pope was then taking Flexeril and Percodan. Dr. Carter was of the opinion that in an eight-hour day, Pope could walk for two hours, stand for four hours, sit for up to eight hours and could lift up to ten pounds all day or up to twenty pounds occasionally. She stated that Pope's use of her extremities was not limited in any way.

The treatment notes of Dr. Larry Brazley from October, 1985, to February, 1986, indicated that Pope had a decreased range of motion of the spine, a right antalgic gait, positive straight leg raising bilaterally, decreased reflexes in the lower extremities and possible weakness in the extensor muscles of L4–L5. He noted that she had undergone a great deal of treatment and that in his opinion she suffered from herniated lumbar disc syndrome and chronic decompensated lumbosacral strain syndrome with soft tissue rheumatism. Dr. Brazley also found a sensory loss of the skin of the L4, L5 and S1 region.

Pursuant to the Appeals Council remand order, Dr. Steven Bayer conducted a consultative neurological exam. He noted the claimant's complaints of back pain, with hip pain radiating down her right leg. He also considered the numerous negative myelograms and CT scans, and that a prior EMG had to be terminated because of pain. A physical examination revealed a mild weakness in the hip flexors, straight leg raising that was negative on the left and questionably positive on the right at 50 degrees, together with decreased sensation to pin prick in the right foot. He described Pope's gait and station as unremarkable, and found that there was no clear weakness, atrophy or reflex changes in her right leg to suggest definite radiculopathy. Atrophy and weakness would have been expected after two

---

4. A discontinuity of tissue or loss of function pertaining to or located near the sciatic nerve.

Dorland's, *supra*, at 913, 1494.

years if there had been a large disc herniation. He suggested that Pope might have arachnoiditis[5] with secondary radiculopathic features, and that if so, he would not expect significant improvement in the future. Dr. Bayer was of the opinion that her ability to lift, bend, push or pull was limited.

In response to specific interrogatories from the ALJ, Dr. Bayer submitted a second report in which he stated that he believed Pope could perform sedentary work and was generally credible.

The ALJ applied the sequential evaluation and decided the case at Step Five. He found that Pope had not engaged in gainful employment since April 1, 1984, did not suffer from an impairment or combination of impairments listed in or equivalent to one listed in Appendix 1, Subpart P, Regulations No. 4, and could not perform her past work. He then found that she has the residual functional capacity (RFC) to perform sedentary work, and concluded that Pope was not disabled.

## II.

█ Pope contests the ALJ's finding that she is not disabled.[6] We will affirm the Secretary's findings if we find they are supported by substantial evidence. 42 U.S.C. § 405(g); *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir.1992). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1424, 28 L.Ed.2d 842 (1971). While we do not decide the facts anew, we review the record in its entirety to determine whether substantial evidence supports the ALJ's decision. *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir.1989).

### A. *Equivalency Determination at Step Three*

█ Pope contends that the ALJ erred at Step Three in concluding that her impairments, individually or in combination, did not meet or equal any of those listed in Subpart P. Specifically, she submits that she met listing 1.05 C. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.05 C (1992). Listing 1.05 C provides:

> other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:
>
> 1. Pain, muscle spasm, and significant limitations of motion in the spine; and
>
> 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

The applicant must satisfy all of the criteria in the Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).

█ While Pope undoubtedly suffers pain and has physical disorders, there is substantial evidence in the record that Pope did not meet all of the requirements of 1.05 C. It is sufficient to note that a number of medical reports indicated that there was no or only minimal muscle weakness, sensory loss and reflex loss. *See Scott v. Sullivan*, 898 F.2d

---

5. Inflammation of the membrane covering the spine. Dorland's, *supra*, at 118.

6. Pope also contends that she was denied her right to cross-examine and respond to evidence when the ALJ submitted interrogatories to Dr. Bayer and admitted his responses without her knowledge. Pope did not object to the admission of this evidence in her appeal to the Appeals Council, however. Although she was not aware of the interrogatories and response prior to the ALJ's decision, the decision clearly relied upon the second report of Dr. Bayer, and put Pope on notice of her right to cross-examine. The decision reads, in pertinent part:

> After receiving a letter from the Administrative Law Judge requesting certain clarifications

with respect to his report, Dr. Bayer submitted a second report (Exhibit 39). In that report, he states that he believed the claimant to be generally credible, in that her responses in the examination were consistent. However, he stated specifically that he believed the claimant could perform sedentary work.

ALJ Decision (Oct. 29, 1986) at 20. At that point, it became incumbent upon her to challenge the admission of the evidence. Since the challenge was not raised administratively, we will not review the issue here. *Papendick v. Sullivan*, 969 F.2d 298, 302 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 968, 122 L.Ed.2d 124 (1993).

519, 523 (7th Cir.1990). On January 2, 1985, Dr. Anigbo reported that the claimant had no definite sensory loss, with only slight reflex loss in her right ankle. Moreover, Dr. Aghaji reported on January 9, 1985, that there was no evidence of motor, sensory or reflex loss, or muscle weakness.

■ A reviewing physician also determined that she did not equal the listings, and signed a SSA–831–U5 form. This is proof that a physician designated by the Secretary has considered the equivalency question, and the ALJ may rely upon the physician's opinion to determine eligibility. *Scott v. Sullivan*, 898 F.2d at 524; *Waite v. Bowen*, 819 F.2d 1356, 1360 (7th Cir.1987). Although Pope correctly points out that this determination was completed prior to the hearing as part of the decision reconsidering her initial denial of benefits, she failed to introduce any evidence contradicting this equivalency opinion. *Scott*, 898 F.2d at 524 (holding that updated equivalency opinion not necessary even when initial opinion was given prior to hearing); *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir.1988).[7]

■ Pope next contends that, even if she did not satisfy all of the criteria under Listing 1.05 C, the ALJ should have made a finding of equivalency based on her subjective symptoms of pain, again relying on the rescinded SSR 83–19. Because pain is one of the listed criteria, however, it cannot be used to substitute for others not satisfied. *See* SSR 88–13, *Titles II and XVI: Evaluation of Pain and Other Symptoms* ("an alleged or reported increase in the intensity of a symptom, cannot be substituted no matter how severe, for a missing or deficient sign or finding").

■ Finally, Pope argues that the ALJ did not specifically state in what way the evidence was deficient. All that is required, however, is that "[a]n ALJ ... minimally

articulate his or her justification for rejecting or accepting specific evidence of disability.... But he or she need not provide a written evaluation of every piece of evidence that is presented." *Steward*, 858 F.2d at 1298. The ALJ held that:

> The record does not show an impairment which meets the requirements or equals the severity of any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. The claimant's impairments are not attended by the findings specified under Section 1.01 or any other section of the listings, nor do the reported clinical findings and laboratory test results indicate that the claimant has an impairment which approaches the level of severity contemplated in Appendix 1. Disability cannot, therefore, be established under Section 416.920(d).

ALJ Dec. (Oct. 29, 1986) at 5. Although not a model of clarity, we think that this was enough. *See Waite*, 819 F.2d at 1359.

### B. *The Evaluation of Pain at Step Five*

Pope also contends that the ALJ's adverse determination at Step Five should be reversed because the ALJ failed to consider her subjective complaints of pain, contrary to recently promulgated clarifying regulations. The ALJ held that Pope retained the capacity to perform sedentary work, principally relying upon Dr. Carter's evaluation that in an eight-hour day, she could walk up to two hours, stand up to four hours and sit up to eight hours, and upon Dr. Bayer's opinion that she could perform sedentary work. On appeal, the district court affirmed the ALJ's Step Five determination under the test announced in *Veal v. Bowen*, 833 F.2d 693, 698 (7th Cir.1987). In that case, we stated that for subjective complaints of pain to be disabling, the plaintiff must show:

---

7. Pope also suggests that the ALJ abused his discretion in not asking for another equivalency opinion, principally relying on Social Security Ruling (SSR) 83–19, *Titles II and XVI: Finding Disability on the Basis of Medical Considerations Alone—The Listing of Impairments and Medical Equivalency*. This ruling, however, has since been rescinded and reliance upon it is unjustified. *See Memorandum from Associate Commis-*

*sioner Eilleen Bradley Rescinding SSR 83–19* (Apr. 27, 1990). Furthermore, even if the ruling was still applicable, it only would have required a new opinion if "additional medical evidence is received which, in the opinion of the ALJ, may change the [earlier determination]." *See Steward*, 858 F.2d at 1299. There is nothing in the record which indicates that the earlier equivalency opinion was erroneous.

1) evidence of an objectively adduced abnormality *and, either* 2) objective medical evidence supporting the subjective complaints issuing from that abnormality, *or* 3) that the abnormality is of a nature in which it is reasonable to conclude that the subjective complaints are a result of that condition.

*Id.* at 698 (emphasis in original). The district court held that the ALJ found the first part of the test satisfied, but not parts two or three.[8] Pope failed part two, the district court held, because the ALJ made a reasonable decision on a record of conflicting evidence that Pope's complaints were not supported by the objective evidence. Specifically, that although Pope clearly had some pain, the evidence regarding the *degree* of Pope's pain was conflicting. The court then held that she failed at part three given the ALJ's determination that her subjective complaints of pain were inconsistent with the medical findings, and thus, not credible.

In order to determine whether the ALJ's decision is supported by substantial evidence, we must first determine what rule of law the ALJ should have applied in evaluating her claim. The parties have disputed what the standard should be in evaluating claims of pain. Our cases since *Veal* have read the regulations, which were somewhat ambiguous, to require a rather restrictive approach toward the evaluation of subjective complaints of pain. Although the *Veal* rule did not do so, cases such as *Moothart v. Bowen,* 934 F.2d 114, 116 (7th Cir.1991), and *Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir.1987), have limited the use of pain in making a disability determination to only those complaints the intensity and persistence of which are supported by objective medical evidence. The Secretary, however, has recently promulgated regulations clarifying when pain should be considered. 56 Fed.Reg. 57,928 (1991) (codified at 20 C.F.R. §§ 404.1529 and 416.929 (1992)). The regulations provide for a two-step process in evaluating whether subjective complaints of pain contribute to a finding of disability:

(1) For pain or other symptoms to contribute to a finding of disability, an individual must first establish, by medical signs and laboratory findings, the presence of a medically determinable physical or mental impairment which could reasonably be expected to produce the pain or other symptoms alleged; and (2) once such an impairment is established, allegations about the intensity and persistence of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in evaluating the impairment and the extent to which it may affect the individual's capacity for work.

*Id.* As the regulations and commentary make clear, the Secretary does not "require objective medical evidence to corroborate statements about the intensity, persistence, and functional effects of pain or other symptoms.... [and] will not reject the statements of the individual ... solely because the available objective medical evidence does not substantiate these statements." *Id.* at 57,932. Under our rulings in *Moothart* and *Walker,* the objective medical evidence must support not only the existence but also the degree and persistence of the pain. If that is the correct interpretation of the statute and regulations, this opinion could end here, because while the objective medical evidence supported a finding of some pain, it could not, standing alone, support a finding of disabling pain to the extent alleged in Ms. Pope's subjective complaints. If, however, the Secretary's recent clarifying regulations apply, we have to do a much closer review of the evidence that was before the ALJ. Thus, we first address the question of what the appropriate standard is for evaluating pain claims.

*1. Applicable Standard for Pain Claims*

█  Although the new regulations were promulgated after Pope's hearing, their application in evaluating the standard that the ALJ should have applied is warranted. The sole purpose of the regulations was to clarify

---

**8.** The ALJ actually made no mention of *Veal* or any other of our cases discussing evaluation of pain. The district court, in reviewing the ALJ's

the law on the evaluation of pain,[9] and they expressly provided that "these final rules make no substantive change in our policy." 56 Fed.Reg. at 57,928. The distinction is important because a rule changing the law is retroactively applied to events prior to its promulgation only if, at the very least, Congress expressly authorized retroactive rulemaking and the agency clearly intended that the rule have retroactive effect. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). A rule simply clarifying an unsettled or confusing area of the law, on the other hand, does not change the law, but restates what the law according to the agency is and has always been: "It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." *Manhattan General Equip. Co. v. Commissioner*, 297 U.S. 129, 135, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936); *see also Pennzoil Co. v. United States Dep't of Energy*, 680 F.2d 156 (Temp.Emer.Ct.App.1982), *cert. dismissed*, 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983); Kenneth Culp Davis, Administrative Law Treatise § 7:23 (2d ed. 1979). In *Homemakers North Shore, Inc. v. Bowen*, we noted the important distinction between a clarifying rule and one that effects a substantive change in the law. *Homemakers*, 832 F.2d 408, 411 (7th Cir.1987) (citing *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 756–58 (D.C.Cir.1987) (enunciating non-retroactive rule affirmed by Supreme Court in *Bowen*) *aff'd*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). In that case, we held that a clarifying regulation promulgated by the Secretary related back to a dispute brought under an earlier version of the regulation. We reasoned that "[n]ew language need not imply new substance" and that, despite the differing language in the two regulations, the agency had only one position. *Homemakers*, 832 F.2d at 413.

█ In determining whether a rule is a clarification or a change in the law, the intent and interpretation of the promulgating agency as to the effect of the rule is certainly given great weight. They are not, however, dispositive. If they were, an agency could make a substantive change merely by referring to a new interpretation as a "clarification." *Id.* at 412. Accordingly, in *Homemakers* we reviewed the earlier positions of the Secretary to verify that the "clarification" was not a substantive change in the law—notwithstanding the fact that the Secretary indicated that the subsequent regulation was simply a clarification. *Id.* at 413. In *Massey Motors, Inc. v. United States,* 364 U.S. 92, 80 S.Ct. 1424, 4 L.Ed.2d 1592 (1960), moreover, the Supreme Court similarly reviewed the Commissioner's past administrative practices in relating back a tax regulation interpreting the term "useful life" for depreciation purposes to a tax period preceding the enactment of the code and the regulation in question. The Court found that the regulation was consistent with the Commissioner's prior position even though, as the dissenters pointed out, the Commissioner had taken a different position in numerous cases in the Tax Court. *Id.* at 108, 80 S.Ct. at 1424 (Harlan, J., dissenting and concurring). *See also Pauley v. Bethenergy Mines, Inc.,* — U.S. —, —, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991) ("judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views."). Hence, we will defer to an agency's expressed intent that a regulation is clarifying unless the prior interpretation of the regulation or statute in question is patently inconsistent with the later one.

█ With regard to consistency, we believe that the new regulations are entirely in line with the previous interpretations respecting the evaluation of pain though the former were not unambiguous. In 1984, Congress amended the Act "to promote a national, uniform standard for the evaluation of pain and to eliminate inconsistencies in the standard as applied by various levels of adjudicators." *Bunnell v. Sullivan,* 947 F.2d 341,

---

decision, fit the ALJ's findings into the *Veal* framework.

**9.** That the regulations warranted clarification can be seen from the fact that this court's inter-

pretation of the regulations in *Moothart* and *Walker* differed from the interpretation of the same language by other courts, see below.

344 (9th Cir.1991) (en banc) (citing S.Rep. No. 466, 98th Cong., 2d Sess. 1 (1984)). The standard codified in the statute was to govern disability claims until January 1, 1987, pending a study by the Secretary's Commission on the Evaluation of Pain.[10] The amendments provided:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

42 U.S.C. § 423(d)(5)(A) (1988). This language parallels the language employed in the Secretary's regulations[11] and the legislative history of the amendments confirms that Congress was codifying the Secretary's standard for evaluating pain.[12] The Senate Report on the amendments stated that the statutory standard was "identical to the current rule applied by the Administration." S.Rep. No. 466, *supra,* at 3. Similarly, the Conference Report provided: "The statutory language providing for an interim standard for evaluation of pain is amended to more accurately reflect current policies." H.R.Conf. Rep. No. 1039, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 3038, 3086–87.

In *Polaski v. Heckler,* 751 F.2d 943, 948–49 (8th Cir.1984), *vacated on other grounds,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 (1986), the Secretary articulated the regulatory policy on evaluating pain at the time of statutory codification:

> A claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment. Symptoms such as pain, shortness of breath, weakness, or nervousness are the individual's own perceptions of the effects of a physical or mental impairment(s). Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify. *As a result of this difficulty, some adjudicators have misinterpreted the Secretary's policies as enunciated in SSR–82–58.* [Emphasis added [in *Polaski* ].]

> In particular, some adjudicators may have misinterpreted Example No. 2 in SSR–82–58 to allow allegations of pain to be disregarded solely because the allegations are not fully corroborated by objec-

---

**10.** Congress has yet to enact further legislation on the evaluation of pain. In 1986, the Secretary's Commission on the Evaluation of Pain submitted 13 recommendations to Congress. The Commission recommended, among other things, additional research on the assessment of pain, as well as maintaining the current standard until the research was completed. 56 Fed.Reg. at 57,928.

**11.** In 1983, sections 404.1529 and 416.929 provided:

> If you have a physical or mental impairment, you may have symptoms (like pain, shortness of breath, weakness or nervousness). We consider all your symptoms, including pain, and the extent to which signs and laboratory find-

ings confirm these symptoms. The effects of all symptoms, including severe and prolonged pain, must be evaluated on the basis of a medically determinable impairment which can be shown to be the cause of the symptom. We will never find that you are disabled based on your symptoms, including pain, unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms.

**12.** The new regulations also state that the statutory amendments codified the approach taken by the Secretary, which the new regulations merely clarify. 56 Fed.Reg. at 57,928.

tive medical findings typically associated with pain.

The Secretary declared that "[i]n sum, the approved language is merely a restatement of the standard which the Secretary has been following all along." *Id.*

This standard was elaborated further in the Secretary's Program Operations Manual System (POMS), a seven page circular issued in 1985. In *Avery v. Secretary of Health and Human Servs.*, 797 F.2d 19, 24 (1st Cir.1986), the court relied on this manual (appended to its decision) "as the latest word on departmental pain policy" to moot the plaintiffs' claim for relief. The manual directs adjudicators to evaluate all the evidence before dismissing an applicant's subjective complaints of pain, even when the objective evidence does not support the intensity of pain alleged.

The Secretary again attempted to provide guidance in this area in SSR 88–13, which mirrors the policy found in POMS. Specifically, SSR 88–13 requires adjudicators to investigate evidence relating to subjective complaints of pain, to describe the relationship between the medically determinable impairment and the RFC assessment and, finally, to explain the conclusions that follow. The ALJ should consider:

the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

SSR 88–13.[13]

Finally, it is noteworthy that the approach outlined in the regulations is consistent with that taken by every circuit except, apparently our own. *See Avery*, 797 F.2d at 21; *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir.1983); *Green v. Schweiker*, 749 F.2d 1066, 1070–71 (3d Cir.1984); *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir.1989); *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir.1989); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir.1989); *Penn v. Sullivan*, 896 F.2d 313, 315 (8th Cir.1990); *Bunnell*, 947 F.2d at 348; *Luna v. Bowen*, 834 F.2d 161, 164–65 (10th Cir.1987); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991); *Brown v. Bowen*, 794 F.2d 703, 706 n. 4 (D.C.Cir.1986).

In short, the Secretary's position on the evaluation of pain has remained consistent. Thus, we defer to the Secretary's interpretation that the new regulation was simply a clarification and not a substantive change in the law. The issue then becomes the effect of the new regulations on our more restrictive standard on the evaluation of pain. In *Thomas v. Sullivan*, 801 F.Supp. 65, 72–73 (N.D.Ill.1992), and *Shields v. Sullivan*, 801 F.Supp. 151, 160 n. 16 (N.D.Ill.1992), a district court in this circuit addressed this issue. In those cases, Judge Shadur held that the regulations worked to supersede this circuit's restrictive test. We agree. In *Homemakers*, we indicated that "[a]n ambiguous legal rule does not have a single 'right' meaning" and the interpretation given to the rule is an act of policymaking. *Homemakers*, 832 F.2d at 411.

When the ambiguous rule falls within an agency's congressionally delegated authority, it is the chosen policymaker, and the agency, not the courts, which must select among conflicting interpretations of the rule: "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844, 104 S.Ct. 2778,

---

13. These considerations are also essentially identical to those outlined in SSR 82–58, reiterated by the Secretary in *Polaski. See Polaski*, 751 F.2d at 948.

2782, 81 L.Ed.2d 694 (1984). This deference is especially appropriate when we are faced with an agency's interpretation of its own regulation. *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *United States v. Larionoff*, 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). "[T]he ultimate criterion [in interpreting a regulation] is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles*, 325 U.S. at 414, 65 S.Ct. at 1217. Therefore, when our interpretation is shown to be inconsistent with that of the agency's, we must give way to the agency. Indeed, regulations promulgated to clarify disputed interpretations of a regulation are to be encouraged. "Tidying-up" a conflict in the circuits with a clarifying regulation "permits a nationally uniform rule without the need for the Supreme Court to essay the meaning of every debatable regulation." *Homemakers*, 832 F.2d at 412–13; *cf. Braxton v. United States*, —— U.S. ——, ——, 111 S.Ct. 1854, 1857, 114 L.Ed.2d 385 (1991) ("Congress itself can eliminate a conflict [in the circuits] concerning a statutory provision by making a clarifying amendment to the statute, *and agencies can do the same with respect to regulations*." (emphasis added)).

■ Consequently, the Secretary's position was and is the standard for evaluating subjective complaints of pain and we accept it. Pope contends that the Secretary violated her own standard in denying her disability benefits. The Secretary is bound by her own regulations and rulings until she changes them, even when the action under review is discretionary. *See Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991); *NLRB v. Kemmerer Village, Inc.*, 907 F.2d 661, 663 (7th Cir.1990); *Cardoza v. Commodity Futures Trading Comm'n*, 768 F.2d 1542, 1550

(7th Cir.1985). "[T]he fact that people in the chain of command have expressed divergent views," *Homemakers*, 832 F.2d at 413; *see also SEC v. National Student Mktg. Corp.*, 538 F.2d 404, 406–07 (D.C.Cir.1976) (views of agency staff or individual commissioners not considered official expression of Commission), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 809, 811, 50 L.Ed.2d 790, 791 (1977), or that appellate counsel have taken "convenient litigating position[s]," [14] *Bowen*, 488 U.S. at 212–13, 109 S.Ct. at 474; *cf. Massey Motors*, 364 U.S. at 108, 80 S.Ct. at 1424 (Harlan, J., dissenting and concurring) (noting contradictory position taken in administrative adjudications), contributing to inconsistent interpretations by this court, does not permit the Department to disregard its own regulations.

## 2. *Substantial Evidence for the ALJ's Decision*

■ Since we find that the current regulation is the correct standard to apply in this case, we can not affirm the ALJ's decision simply because the objective medical evidence may not support the extent of pain claimed by Ms. Pope. Instead we must evaluate all of the evidence, including medical evidence, Ms. Pope's claims, and the evidence of her daily activities, as well as the ALJ's observations of Ms. Pope herself, and determine if there is substantial evidence overall supporting the ALJ's decision. Although we cannot discredit a complaint of pain simply because objective medical evidence was not introduced to support the extent of the pain, neither are we required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work.

■ The ALJ considered evidence from five different doctors. Dr. Potti, a treating physician, stated that Ms. Pope was completely disabled, bedridden and wheelchair bound. Because this was inconsistent with the evidence of every other doctor, and indeed with Ms. Pope's own testimony and

---

**14.** In the present case, appellate counsel for the Secretary have argued that the regulations had no effect prior to their date of promulgation, notwithstanding the Secretary's statement that the regulations were meant to clarify existing law. Counsel even went so far as to argue that the new pain regulations simply codified the approach taken in *Veal* and its progeny. Appellee's Br. at 31.

appearance before the ALJ, the ALJ found Dr. Potti to be not credible. We will not disturb a credibility finding unless it is "patently wrong in view of the cold record." *Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). In this case the ALJ's credibility finding seems to be clearly right.

In addition to Dr. Potti, there were four doctors who made statements relevant to Ms. Pope's physical ability to work. Only the evidence of Dr. Bicalho suggested that Ms. Pope was unable to do even sedentary work; although he didn't say so explicitly, he stated that she could do no work involving standing, walking, or sitting for long periods of time. Dr. Brazley, another treating physician, noted that she had "a right antalgic gait" (essentially a limp), and decreased range of motion of the spine (supporting the other evidence that she could not bend). He did not, however, express any opinion on Ms. Pope's ability to sit for extended periods of time or do the other things required for sedentary work.

Two different consulting physicians gave reports to the ALJ. Both of them found that Ms. Pope was able to sit for extended periods of time, as long as she could rise on occasion, and that she could stand and walk for brief periods. They both specifically reported that she was capable of performing sedentary work. Thus, there was clear evidence from two doctors that Ms. Pope could perform sedentary work, no opinion expressed by one doctor, and the implication on behalf of another doctor that she could not perform sedentary work. The ALJ also considered Ms. Pope's credibility, and found it lacking, a determination which we do not find "patently wrong." *Imani, supra.* Specifically, the ALJ, in his first decision, noted that the claimant had filed an earlier disability claim, based on symptoms that had since disappeared. He found this evidence of a tendency to exaggerate symptoms. Finally, the ALJ considered Ms. Pope's daily activities which include light chores and reading. On this record there is substantial evidence to support the ALJ's finding that Ms. Pope could perform sedentary work, and was not disabled.

III.

The Secretary has clarified her regulation dealing with subjective complaints of pain. Consequently, our earlier understanding of the regulation must be modified. Under the current regulation, however, the ALJ's decision in this case is still supported by substantial evidence. It is, therefore,

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

Although I agree with the opinion in major part, I would vacate and remand for application by the ALJ of the clarified pain standard. *See, e.g., Penn v. Sullivan,* 896 F.2d 313, 316 (8th Cir.1990); *Thomas v. Sullivan,* 801 F.Supp. 65, 73–74 (N.D.Ill.1992). I am in complete agreement with the majority's analysis of the standard.