Betty GIBSON–JONES, Plaintiff,

v.

Shirley CHATER, Commissioner of the
Social Security Administration,[1]
Defendant.

No. 95 C 874.

United States District Court,
N.D. Illinois,
Eastern Division.

May 14, 1996.

1. Effective March 31, 1995, the Commissioner of Social Security assumed the function of the Secretary of Health and Human Services in social security cases. In accordance with Section 106(d) of P.L. No. 103–296, Shirley S. Chater, the Commissioner of Social Security, has been substituted for Donna Shalala, the Secretary of Health and Human Services, as the defendant in this case.

Beth A. Alpert, Beth A. Alpert & Associates, Chicago, IL, for plaintiff.

Michele Marion Fox, United States Attorney's Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Plaintiff, Betty Gibson–Jones, applied for Disability Insurance Benefits and Supplemental Security Income Benefits on April 28, 1992. After a hearing in October, 1993, Administrative Law Judge ("ALJ") Charles N. Bono ruled that Ms. Gibson–Jones retained a residual functional capacity for sedentary work which enabled her to perform a significant number of jobs in the national economy. He therefore denied her request for benefits. The Appeals Council denied Ms. Gibson–Jones' request for review. On February 10, 1995, Ms. Gibson–Jones brought the present action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Health and Human Services ("Commissioner"). Both parties have filed motions for summary judgment. For the reasons set forth below, the Commissioner's motion is granted, and Ms. Gibson–Jones' motion is denied.

### Facts

Ms. Gibson–Jones testified to the following facts, as they existed at the time of the hearing before the ALJ. She was twenty-seven years old and had three small children. Tr. 46–47. She was separated from her husband. Tr. 66. Ms. Gibson–Jones completed high school and had also obtained approximately two years of college credit. Tr. 47. Ms. Gibson–Jones was in the United States Army from January of 1985 to April of 1992. Tr. 47. Although Ms. Gibson–Jones stated that she became disabled in August of 1990, she was able to remain in the army for twenty months longer in "patient hold" status. Tr. 48. During her time in "patient hold," Ms. Gibson–Jones remained in the service at her full salary, though she did not do her regular job. Tr. 48. Ms. Gibson–Jones did not receive a medical discharge from the army but instead was "bought out" for $17,-000 under the Service Selective Benefits program. Tr. 49–50.

While in the army, Ms. Gibson–Jones worked in personnel services where she performed filing, typing, record maintenance, and computer programming. Tr. 51. Ms. Gibson–Jones also did combat training which required strenuous physical activity. Tr. 51. Before enlisting in the army, Ms. Gibson–Jones worked as a sales clerk at Marshall Fields. Tr. 52. In March of 1992, Ms. Gibson–Jones took a job as a secretary at a hospital. Tr. 50. She quit after a week because she "wasn't able to handle the duties." Tr. 50. Ms. Gibson–Jones has not worked since then. Tr. 50, 52.

Ms. Gibson–Jones's health problems began in November of 1987 when she gave birth to her first child by cesarean section. Tr. 52. After this birth she experienced pain, fainting spells, and bleeding. Tr. 52. In September of 1990, Ms. Gibson–Jones underwent a laparoscopic tubal ligation during which the surgeon discovered that her uterus had been lacerated and sutured onto her abdominal wall. Tr. 271. She was then diagnosed with severe pelvic adhesive disease. Tr. 465. After experiencing chronic pelvic pain, dysmenorrhea and dyspareunia,[2] she ultimately had a total abdominal hysterectomy in January of 1991. Tr. 216, 224. Subsequently she had an ultrasound performed which showed a hypoechogenic lesion located immediately superior and slightly anterior to the dome of the urinary bladder. Tr. 496. She continued to experience more pelvic pain and dyspareunia. Tr. 216. Treatment notes from August of 1991 indicate that Ms. Gibson–Jones was restricted from heavy lifting and activities requiring quick movements. Tr. 445.

In October of 1991, Ms. Gibson–Jones was again hospitalized and diagnosed with severe dysmenorrhea and severe dyspareunia with diffuse, extensive pelvic adhesive disease. Tr. 415. A sonogram revealed a predominately cystic mass in the left lower quadrant and a small mass in the right lower quadrant. Tr. 215.

In November of 1991, Ms. Gibson–Jones was admitted to the hospital for chronic pelvic pain and diagnosed with endometriosis.

Tr. 166–67. She refused a laparoscopy to correct the problem, instead choosing medication. Tr. 167. Thereafter, Ms. Gibson–Jones continued to complain of pain to her doctors. On October 15, 1992, a pelvic ultrasound revealed a small left ovarian cyst. Tr. 346. On May 6, 1993, Ms. Gibson–Jones underwent an exploratory laparotomy with bilateral salpingooophorectomy. Tr. 322. A benign pelvic mass was removed during the surgery. Tr. 330–31.

Ms. Gibson–Jones testified that the various surgical procedures she had undergone had not corrected her problems and that she was concentrating, on her doctors' recommendation, on "pain management." Tr. 53–54. She described her pain as sharp and sometimes intense and stated that it was constantly present. Tr. 54. She stated that to alleviate the pain, she would lie down and take percocet, tylenol–3, and Motrin. Tr. 55. These medications make her dizzy, drowsy, and nauseated to the point that she can barely walk. Tr. 55. She testified that the side effects of the medication lasted approximately two to three hours. Tr. 58. Despite its side effects, she continues to take this medication on a daily basis. Tr. 56. She testified that without the medication, she is in extreme pain. Tr. 58.

Ms. Gibson–Jones testified that she could sit comfortably for one to one and one-half hours, and could stand comfortably for two to two and one-half hours before needing to change positions. Tr. 60–61. She stated that she needed to lie down with her feet elevated twice a day. Tr. 61. She also complained that she needed help with her three young children and with grocery shopping. Tr. 65. She stated that her cousin was staying with her to provide this help. Tr. 65.

At the time of the hearing, Ms. Gibson–Jones was attending college, taking 13 credit-hours, through a vocational rehabilitation program with the Veterans' Administration. Tr. 47. She maintained a grade point average of 3.75. Tr. 57. When asked how she was able to attend classes if she endured such severe pain and medication side-effects,

---

2. Dysmenorrhea is defined as "difficult and painful menstruation." STEDMAN'S MEDICAL DICTIONARY 433 (1982). Dyspareunia is defined as "[t]he occurrence of pain during sexual intercourse." Id. at 434.

Ms. Gibson–Jones stated that she attended class for about an hour in the morning, went home for three hours to take her medication and nap, and then went back to school for two more hours of class. Tr. 56. She also stated that she stood often and never had to sit for a long time at school. Tr. 61. She testified that she had class from 9:00 to 9:50 and then again from 1:00 to 2:50. Tr. 56. She stated that she had missed three months of classes the previous semester. Tr. 57. She testified that she was able to do well at school, however, by keeping up with her assignments at home. Tr. 58. She testified that she was pursuing a professional degree so that she would be able to find a job with flexible work hours. Tr. 70.

G. Robert McClellan, a vocational expert, testified at the hearing before the ALJ. Tr. 76. He classified her previous work as skilled. Tr. 76 He stated that Ms. Gibson–Jones had acquired clerical skills in her past work that would transfer to sedentary jobs as a telephone quotation clerk, receptionist, order clerk, cashier, posting clerk, transcript clerk, classification clerk, and credit clerk. Tr. 78. He stated that there would be a minimum of 2,000 such jobs in the region, and there would be over 100,000 such jobs in the nation. Tr. 78. According to Mr. McClellan, these jobs would allow flexibility in changing positions from sitting to standing and walking. Tr. 79. He admitted that if Ms. Gibson–Jones needed to lie down, as she testified, she would not be able to perform such work. Tr. 79.

### Discussion

#### A. *Standard of Review*

■ The Social Security Act provides for limited judicial review of final decisions of the Commissioner. The role of this court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. 42 U.S.C. §§ 405(g), 1383(c)(3); *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir.1993) (citations omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir.1993) (citation omitted). In determining whether the Commis-

sioner's findings are supported by substantial evidence, the district court may not "reevaluate the facts, reweigh the evidence, or substitute [its] own judgment for that of the [Commissioner]." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.1994) (citation omitted). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir.1990) (citations omitted); *Edwards v. Sullivan*, 985 F.2d 334, 336–37 (7th Cir.1993).

After consideration of the entire record, ALJ Bono concluded that Ms. Gibson–Jones was not "disabled" within the meaning of the Social Security Act. Tr. 31. He found that Ms. Gibson–Jones retains the residual functional capacity to do sedentary work. Tr. 31. *See* 20 C.F.R. § 404.1520(e). The ALJ further concluded that the skills she had acquired in the army would permit her to perform available jobs in the national economy. Tr. 31. *See* 20 C.F.R. § 404.1520(f).

#### B. *Sequential Evaluation*

In order to qualify for Disability Insurance or Supplemental Security Income Benefits, a claimant must be disabled. *Pope*, 998 F.2d at 477. The Act defines a "disabled" individual as one who is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. To satisfy this definition, an individual must have a severe impairment which makes her unable to perform her previous work or any other substantial gainful activity which exists in the national economy. 20 C.F.R. § 416.1505.

The Social Security regulations require the factfinder to follow a five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. The Seventh Circuit has summarized the test as follows:

> The [Commissioner] must determine in sequence: (1) whether the claimant is currently employed; (2) whether she has a

severe impairment; (3) whether her impairment meets or equals one listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing any work in the national economy. Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job.

*Pope,* 998 F.2d at 477–78 (citing *Schroeter v. Sullivan,* 977 F.2d 391, 393 (7th Cir.1992)).

In the present case, ALJ Bono applied the sequential evaluation and decided the case at Step Five. He found that Ms. Gibson–Jones has not engaged in substantial gainful activity since August of 1990. Tr. 30. He also found that she suffers from pelvic adhesive disease, which required a tubal ligation; lysis of adhesion; revision of scarring, adhesiolysis, and total abdominal hysterectomy; endometrioma requiring Lupron therapy; pelvic mass requiring adhesiolysis and bilateral salpingo—oophorectomy, and chronic recurrent urinary tract infections. Tr. 30. He concluded that Ms. Gibson–Jones does not have an impairment or combination of impairments listed in or medically equal to one listed in the applicable regulations; and that she retains the capacity for sedentary work with a sit/stand option, and therefore is capable of performing jobs which exist in significant numbers in the local and national economies. Tr. 30–31. Consequently, the ALJ found Ms. Gibson–Jones was "not disabled" within the meaning of the Act. Tr. 31.

Ms. Gibson–Jones argues that ALJ Bono erred in not finding her "disabled." She contends that the ALJ's conclusion that she is capable of performing sedentary work with a sit/stand option was not supported by substantial evidence.

### C. *Ms. Gibson–Jones' Pain and Side Effects*

█ Ms. Gibson–Jones testified as to two different reasons why she could not perform sedentary work. First, she stated that the pain is sometimes so bad that to alleviate it she has to either take her medication or lie down flat, with her legs elevated. Tr. 61 If she has a "rigorous" day, where she is constantly sitting and standing, she has to lie down and elevate her legs twice a day. Tr. 61. Second, Ms. Gibson–Jones testified that she experiences severe side effects from the pain medication she takes. She gets dizzy, drowsy, and nauseous and has to lie down. Tr. 55. She testified that while on the medication she cannot drive, she cannot do any heavy lifting, and she can barely walk. Tr. 55. She takes the medication either once or twice a day, depending on how active she is. Tr. 55.

Ms. Gibson–Jones also testified that she attends school full-time. She stated that she is able to maintain her classwork despite her pain and side effects because she attends class for short periods with breaks at home between classes. She and the ALJ discussed this issue as follows:

CLMT: Well, Your Honor, I have my classes scheduled. I have to be at class by 9:00, and then I get out at 9:50, go home, take my medication. I sleep for about two, three hours. I have to be back in class at 1:00. I get out at 2:50, then I go back home. The pain is really severe, and then I have to take another dose.

ALJ: Do you take the medication and you go back to school?

CLMT: Yes, at 1:00.

ALJ: But I thought the side effects of the medication made you so you couldn't even walk?

CLMT: Right, when I take the medication.

ALJ: Well, how can you go back to school if you can't even walk?

CLMT: I don't go directly back to school, sir.

ALJ: I don't understand that.

CLMT: From 9:50—well, from 10:00 until 1:00, I have a break. I don't attend classes then.

Tr. 56–57. Ms. Gibson–Jones also testified that the side effects from her medication last two to three hours after she takes the medication. Tr. 58. She further stated that she

often did miss class due to her medical problems, up to three months in one semester alone. Tr. 58.

In making his decision, the ALJ discounted the testimony of Ms. Gibson–Jones on how much pain she suffered and the side effects of her pain medication. He found her testimony that she needed to lie down to alleviate the pain to be not credible or convincing, because it is "inconsistent for the claimant to be able to attend college courses if she experiences such severe symptoms on a disabling regularity." Tr. 28. Ms. Gibson–Jones argues that her testimony is not inconsistent with her class schedule. As she explained to ALJ Bono, she attends class for only an hour in the morning and then goes home to "sleep off" the medication for the two or three hours that the side effects last before returning to school for another two hours of class. At the end of those two hours, she returns home to where she can take her medication and lie down again. Ms. Gibson–Jones also points to the well-established side effects of the medication she takes.[3] She argues that the ALJ's decision to disbelieve her testimony makes his decision unsupported by substantial evidence.

The "ALJ's credibility determination will not be disturbed unless it is patently wrong." *Luna*, 22 F.3d at 690. Here, ALJ Bono's finding that Ms. Gibson–Jones' testimony was inconsistent with her ability to attend school is not patently wrong. Ms. Gibson–Jones testified that she finished class at 9:50, then went home and slept for two, sometimes three, hours, and then made it back to school by 2:00. The ALJ could easily have found this schedule unbelievable. I cannot say that ALJ Bono was wrong for refusing to believe Ms. Gibson–Jones' testimony that she experienced pain and debilitating side effects because it was "contrary to her demonstrated ability to engage in sustained activity by attending college courses in addition to caring for minor children." Tr. 29.

Ms. Gibson–Jones also argues that ALJ Bono should not have relied on the vocational expert's testimony because the hypothetical questions posed to the expert did not accurately reflect Ms. Gibson–Jones' situation, *i.e.*, the questions did not account for the side effects she experiences and her stated need to lie down. ALJ Bono asked him, "Now, you've heard the testimony with respect to Ms. Gibson–Jones' estimates of how long she can sit, stand, walk, etc. Would any of those capacities she's assessed herself to have impact adversely on those sedentary jobs you just described?" Tr. 79. The expert replied that only Ms. Gibson–Jones' stated need to lie down would limit her ability to work a sedentary job. ALJ Bono, however, did not believe Ms. Gibson–Jones' testimony regarding her need to lie down. He therefore need not have considered the vocational expert's response regarding her need to lie down.

For the same reason, ALJ Bono need not have asked the vocational expert specifically about Ms. Gibson–Jones' side effects from the medication. ALJ Bono simply did not believe that Ms. Gibson–Jones had to take pain medication with debilitating side effects every day. He therefore need not have asked the vocational expert about them.

#### D.  *Remarks at the Hearing*

Ms. Gibson–Jones contends that she did not have a full and fair hearing because ALJ Bono made numerous inflammatory statements at the hearing. She objects to his questioning her motives in attending school to obtain a job if she believed that she was disabled and therefore unable to work. I find nothing improper in the ALJ's questions. Moreover, even if the ALJ improperly questioned her, I do not find his questions to rise to a level raising a question about the fairness of her hearing. Although ALJ Bono asked her some pointed questions, the transcript of the hearing does not indicate that he was argumentative or biased.

---

3.  According to the Physician's Desk Reference, percocet and tylenol with codeine have virtually identical side effects: "The most frequently observed adverse reactions include lightheadedness, dizziness, sedation, nausea and vomiting.

These effects seem to be more prominent in ambulatory than in nonambulatory patients, and some of these adverse reactions may be alleviated if the patient lies down." Physician's Desk Reference at 957, 1474 (1995).

### E. *New Evidence*

■ Ms. Gibson–Jones argues that she has "new and material" evidence that warrants a remand so the ALJ may consider it. *See* 42 U.S.C. § 405(g). The evidence she proffers includes an April, 1995 letter from the Department of Veterans Affairs increasing Ms. Gibson–Jones' disability rating for her bladder condition. The defendant argues that this letter is not material because it would be unlikely to change the outcome of the ALJ's decision. Ms. Gibson–Jones maintains that it supports her complaints of incontinence, which the ALJ improperly ignored in his disability determination. I agree with the defendant that the disability assessment by the Veterans Affair does not have a "reasonable possibility" of changing the Commissioner's decision. *See Sears v. Bowen*, 840 F.2d 394, 400 (7th Cir.1988). ALJ Bono had Ms. Gibson–Jones' medical records before him. He is permitted to reach a different conclusion than that reached by Veterans Affairs. Accordingly, the Veterans Affairs assessment of Ms. Gibson–Jones' disability would have little effect on his decision.

■ Ms. Gibson–Jones also submits medical records documenting procedures she had performed between the time of the hearing and the ALJ's decision. The new medical records, however, do not add anything to the ALJ's picture of Ms. Gibson–Jones. ALJ Bono knew about all of Ms. Gibson–Jones' medical problems, but still found that she was capable of performing sedentary work with a sit/stand option. None of the additional medical records submitted by the claimant shows a "reasonable possibility" of changing this outcome. Indeed, Ms. Gibson–Jones does not even make such an argument. She says only that the ALJ said he would attempt to follow up the case by obtaining the additional records before rendering his decision. The fact that he did not do so does not require me to remand this case.

### *Conclusion*

For the reasons set forth above, the Commissioner's motion for summary judgment is granted, and Ms. Gibson–Jones' motion for summary judgment is denied.