Margaret STETLER, Plaintiff,

v.

Donna SHALALA, Secretary of HHS, Defendant.

No. 4:94cv0045 AS.

United States District Court, N.D. Indiana, Hammond Division at Lafayette.

March 21, 1995.

Ralph Robinson, Lafayette, for plaintiff.

Clifford D. Johnson, South Bend, for defendant.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Plaintiff Margaret Stetler ("Stetler") appeals from a final judgment of the Secretary of Health and Human Services ("Secretary") denying her application for Disability Insurance Benefits ("DBI") pursuant to the Social Security Act, 42 U.S.C. §§ 416(i), 423(d). Jurisdiction over Stetler's petition for judicial review is conferred upon this court by 42 U.S.C. § 405(g).

#### A. Procedural History

The claimant initially applied for DBI on May 20, 1991, alleging disability since April 11, 1991. Tr. 80–82. Her application was denied initially and on reconsideration. Tr. 126–27, 116–17. The claimant originally signed a waiver of her right to a hearing (tr. 180–81), and ALJ James R. Norris issued a decision on April 22, 1992 denying benefits (tr. 31–38). On April 27, 1992 Stetler's lawyer wrote to the ALJ explaining that Stetler had erroneously waived her right to appear, and did want to have a hearing. Tr. 182. The ALJ held a hearing on August 12, 1992, at which plaintiff, her counsel, and witness Donna Diaz appeared. Tr. 44–79. The ALJ then issued another decision on January 14, 1994, one and a half years after the hearing. Tr. 7–23. The ALJ states in his January 14, 1994 decision that a hearing was held on "March 12, 1992." Tr. 10. The court can find no record of any such hearing, and can only surmise that the ALJ meant to write "August 12, 1992."

The ALJ in his January 14, 1994 decision determined that Stetler was not disabled. Tr. 11, 22–23. On February 3, 1994 Stetler petitioned the Appeals Council for review (Tr. 5–6), and the Appeals Council denied plaintiff's request for review in a letter dated April 12, 1994. Tr. 3–4. Thus, the ALJ's decision became the final decision of the Secretary. Plaintiff filed her appeal in this court on June 8, 1994.

Ms. Stetler, by her attorney, filed her brief on November 25, 1994. The Secretary filed her response on January 13, 1995. There has been no reply filed by the plaintiff, and the court is now prepared to rule. For the reasons detailed herein, this court must remand this case to the Secretary.

### B. Standard of Review

The Act itself provides the pertinent standard of review: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Secretary's finding that Stetler is not disabled must be upheld if it is supported by substantial evidence. *Pope v. Shalala*, 998 F.2d 473 (7th Cir.1993); *Pitts v. Sullivan*, 923 F.2d 561, 564 (7th Cir.1991). This court will not reweigh the evidence presented at the administrative hearing, *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 388 (7th Cir. 1992), nor will it determine whether Stetler actually was disabled. *Id.; Stuckey v. Sullivan*, 881 F.2d 506, 508 (7th Cir.1989).

Absent an error of law by the Secretary, this court must affirm her decision if there is substantial evidence to support it. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir.1990); *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir.1989). Substantial evidence is that quantum of relevant evidence which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Pope*, 998 F.2d at 473. It may be less than a preponderance of the evidence. *See, Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Young*, 957 F.2d at 389. Substantial evidence may be less than the weight of the evidence and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986).

### C. Description of the Secretary's Decision

The Secretary employs a five-step process to determine whether a claimant is eligible for benefits within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920; *Campbell v. Shalala*, 988 F.2d 741 (7th Cir.1993). The Seventh Circuit has described this sequential inquiry:

> The Secretary must determine in sequence: (1) whether the claimant is currently employed; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy. *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992). Once the claimant has satisfied Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).

*Campbell*, 988 F.2d at 743; *see also Young*, 957 F.2d at 389.

Applying the five-step procedure in this case, ALJ Norris decided that:

1. The claimant met the disability insured status requirements of the Act on April 11, 1991, the date the claimant stated she became unable to work, and continues to meet them through the date of this Decision.

2. The claimant has not engaged in substantial gainful activity since April 11, 1991.

3. The medical evidence establishes that the claimant has a severe impairment but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints, when considered according to the criteria of 20 CFR 404.1529 and Social Security Ruling 88–13 are unsupported by objective medical findings and are not considered to be credible in view of the entire record insofar as the claimant alleged an inability to perform "medium" work.

5. The claimant retains the residual functional capacity to engage in medium level

work activities subject to the following non-exertional impairments: none.

6. The claimant's past relevant work as a nurse's assistant was performed throughout the national economy as a "medium" occupation.

7. The claimant's medically determinable impairments did not prevent her from performing her past relevant work for any consecutive period of twelve months.

8. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this Decision.

Tr. 21–22.

### D. Issue on Review

Stetler contends that the Administrative Law Judge's determination that she was not disabled was not supported by substantial evidence. Specifically, the ALJ found that Stetler was able to perform exertionally medium work, her past relevant work was exertionally medium and she could perform it, therefore finding at Step Four that she was not disabled.

### E. Discussion

■ Ms. Stetler experienced back pain as a result of moving an obese patient on April 11, 1991. She entered the hospital on April 13, 1991 under the care of Dr. Crecilius,[1] who found "possible soft disk herniation" and was "symptomatic from the degenerative disease at L3–4 on the right." Tr. 137. "She underwent laminotomy, foraminotomy, and diskectomy where a hard disk was identified and nerve root decompressed. This provided her with good pain relief of the lower extremity pain." *Id.* On May 29, 1991 Stetler saw Dr. Crecilius and reported that the hip pain was more severe than before the surgery. Tr. 150. Dr. Crecilius felt that she was suffering from depression and persistent pain. *Id.* He wanted to treat her for depression and also start physical therapy, but Stetler rejected that. Tr. 151.

Unless otherwise noted, all references by the court to findings or decisions of the ALJ refer to the January 14, 1994 decision (tr. 10–23). The ALJ first found that the claimant was not engaged in any gainful employment, which resolves Step One of the sequential analysis in her favor. Tr. 13. Next the ALJ found that the claimant was incapable of performing "heavy" or "very heavy" exertion, which represents a significant reduction in residual functional capacity. Tr. 13. Thus, the claimant has a "severe" impairment and Step Two was resolved in her favor. *Id.*

At Step Three the ALJ found that the claimant did not meet any of the Listings alone or in combination. *Id.* The ALJ focused on Listing 1.05, Disorders of the Spine. *Id.* The claimant does not contest this finding, but rather contests Step Four residual functional capacity finding that she can perform at the medium exertional level, and that she can perform her past relevant work.

Substantial evidence does not support the ALJ's finding that the claimant's past relevant work was "medium"; in fact, the ALJ's January 14, 1994 finding on this issue directly conflicts with his April 22, 1992 finding. *Compare* tr. 21 *with* tr. 36. The evidence supports a finding that Stetler's past relevant work was "heavy" or "very heavy," thus the ALJ's finding that she can not perform work above the "medium" level would prevent her from performing her past relevant work. Also, the ALJ's decision is primarily based on his "credibility" determinations. However, while credibility determinations are treated with great deference by this court, some of the findings labeled as credibility determinations in this case are so lacking in support and so patently incorrect that, if they can even be called credibility determinations at all, they are not entitled to much deference.

### Past Relevant Work

One prong of the Secretary's two-prong Step Four evaluation is to determine the "work [claimant has] done in the past." *Brooks v. Sullivan,* 766 F.Supp. 584, 589 (N.D.Ill.1991), *quoting* 20 C.F.R. §§ 404.1520(e) and 416.920(e). Social Security Ruling 82–61 states that a claimant will be found "not disabled" when she can perform either:

---

1. It is uncontradicted that Stetler's doctor was Dr. Gossard, but she saw Dr. Crecilius at this time because Dr. Gossard was serving in Desert Storm. Tr. 49.

1. The actual functional demands and job duties of a particular past relevant job; or,

2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

*Steward v. Bowen*, 858 F.2d 1295, 1300 (7th Cir.1988). However, SSR 82–61 clearly refers to *particular* past occupations, not general classifications. In fact, SSR 82–61 states that "Finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and insupportable." SSR 82–61 also states that there may sometimes be a conflict between the claimant's and the Dictionary of Occupational Titles' (DOT's) description of a job; and "composite" jobs (with significant elements of more than one occupation) have no counterpart in the DOT. Such cases should be evaluated according to the particular facts of the individual case. SSR 82–61.

In this case, the ALJ accepted the VE's opinion that Stetler's past relevant work was as an LPN (Licensed Practical Nurse). For the reasons that follow, this court can not accept that finding as being supported by substantial evidence. While Stetler may have received LPN training in 1976 at Ivy Tech (tr. 105), there is no evidence that she completed that training, or that she was ever licensed. More importantly, the record discloses that Stetler never actually worked as an LPN, but rather worked as a CNA and a QMA. Tr. 95, 105.

The ALJ found in his post-hearing January 14, 1994 decision that Stetler's past relevant work was as a nurse's aid or nurse's assistant, and that such was a "medium" occupation "as performed in the national economy." Tr. 21. He bases this solely on the answer to the interrogatories by Vocational Expert Ray Burger. *See* tr. 227. The ALJ had submitted written interrogatories to the VE, instructing him to assume the past job as outlined by the Vocational Report (tr. 95–100), and to assume the only limitation is to "medium work."

"Medium work" is defined by the applicable regulation as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). "Heavy work" is defined as "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." *Id.* at § 404.1567(d). The regulations define "very heavy work" as "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pound or more." *Id.* at § 404.1567(e).

The VE's response to the ALJ's interrogatories states that Stetler's past relevant work would be listed by the Dictionary of Occupational Titles ("DOT") as "LPN," by which the court assumes he means Licensed Practical Nurse. "Nurse, Licensed Practical" is number 079.374–014 in the DOT, and it does state a "medium" exertional level. However, the DOT also notes that a "licensed practical nurse" must "pass state board examination and be licensed"—not a surprising requirement, given the title. There is no evidence to support the VE's finding that Stetler is an LPN. People with such certifications are generally not shy about it—they place "LPN" after their signature, or at least would state "LPN" when filling out a vocational statement. The court can find no evidence in the record that Stetler is an "LPN."

Indeed, Stetler was quite clear on everything she filled out that she was a "QMA" (Qualified Medication Aid) or a "CNA" (Certified Nurse's Assistant). Tr. 95, 105. These appear to be some type of nurse's aid. With greatest deference to that field, Ms. Stetler's description of her duties in her past relevant work indicates that her job was to do the nurses' hard physical "grunt" work—including "lifting and transferring patients from bed to toilet to wheel chair or bed. Turning patients in bed changing for incontinency.... Lifting patients into the bathtub, lifting patients out of the bathtub. Ambulating patients with walkers or prosthesis." Tr. 100. The VE himself noted that Stetler's work, "as she performed it," was "very heavy." Tr. 227. However, he decided to characterize her past work as an "LPN," which the DOT lists as "medium" as performed in the national economy. *See id.*

It is clear from the record that Stetler's job experience can not be so conveniently lumped into "LPN." The particular facts of her past relevant work should have been explored, and were not. This court does not know whether Stetler's job included work normally done by an orderly or a physical therapist, because neither the ALJ nor the VE explored the facts in the record. Ms. Stetler was very clear in her belief that "There is no way I can work lifting and moving patients." Tr. 106. This was uncontradicted.

Characterizing Stetler's past relevant work as exertionally "medium" is not supported by substantial evidence and is in fact clearly erroneous. The VE himself, in his interrogatory answer, states that Stetler's past relevant work was "as she performed it . . . very heavy." Tr. 227. The only factual findings the ALJ made in respect to Stetler's past relevant work were in his original decision of April 22, 1992, where he found that, "The claimant's past relevant work required her to walk and/or stand for 8 hours in an 8 hour day and to lift 50 pounds frequently and up to 100 pounds occasionally." Tr. 36. This very clearly means "heavy" work under 20 C.F.R. § 404.1567(d). There was no evidence admitted thereafter that could have been a basis to change that determination.

In fact, even if the VE and the ALJ themselves had not determined that Stetler's past relevant work was "heavy" or "very heavy," the evidence very clearly requires that determination. The incident which caused Stetler's debilitating injury, and put her in the hospital for surgery, was lifting an obese patient. The evidence supports the conclusion that such was a normal part of Stetler's work. This court can not see how the Secretary can contend with a straight face that Stetler's past relevant work should be classified as "medium," especially given the VE's opinion *and the ALJ's earlier decision* that it was "heavy" or "very heavy" work.

Apparently, the only reason for the ALJ changing his finding from "heavy" to "medium" was the VE's statement that the DOT listed LPN's as "medium." That is not a proper, appropriate, or supportable basis. The VE clearly states his conclusion that Stetler's past work as she performed it was "very heavy," and only the general DOT description of an LPN was "medium." When an ALJ bases such a determination on the DOT, without taking into consideration the claimant's evidence that her job actually required greater effort, that is reversible error. *See Villa v. Heckler,* 797 F.2d 794, 798–99 (9th Cir.1986); *Smith v. Heckler,* 782 F.2d 1176, 1181 (4th Cir.1986); *Anderson v. Schweiker,* 651 F.2d 306 (5th Cir.1981); *see also Key v. Sullivan,* 925 F.2d 1056, 1062 (7th Cir.1991). This case is actually much worse than those cited; in the cited cases, the ALJ failed to take into consideration the exertional level of the job actually performed by the claimant. Here, the ALJ and the VE both *acknowledged* that Stetler's actual job required much greater exertion than the DOT's listing for LPNs. However, they chose to apply the DOT's rating for LPNs to Stetler, even though they both knew it to be incorrect. To stick with the presumption that the DOT is correct in the face of their demonstrated knowledge (since Stetler is not actually an LPN) is simply inexplicable and certainly insupportable.

If "LPN" is merely the closest occupation listed in the DOT to Stetler's described job, the VE and ALJ would perhaps be justified in basing some findings on the DOT's listing, but certainly not information that conflicts with the uncontradicted evidence of Stetler's duties. Stetler did not say "I am an LPN" and leave it at that, a scenario which would justify unthinking reliance on the DOT. She did not claim to be an LPN at all, and the evidence does not support a finding that she was. She described her job in detail. Her description includes duties beyond that of the DOT's LPN description. If Stetler really were an LPN, the presumption that the DOT's listing was correct would be stronger than where, as here, the DOT's listing is merely a close match to some of the duties of the claimant's past relevant work. The record in this case is faulty, and this court can not perform an appropriate review.

There is not substantial evidence in this record to support the Secretary's determination that Stetler can perform her past relevant work. The ALJ specifically found that

Stetler could not perform greater than "medium" work. Tr. 21. His only *factual* findings in regard to her past relevant work shows that it was "heavy" (*see* tr. 36), and the VE concluded that her past relevant work was "very heavy" (tr. 227). If Stetler had actually been an LPN, but worked harder than typical LPN's, *Steward v. Bowen,* 858 F.2d 1295 and SSR 82–16 would permit reliance on the job requirements as performed in the national economy. However, Stetler never worked as an LPN, and reliance on the DOT's listing for LPN's was not appropriate given the uncontradicted evidence that Stetler's past job was either "heavy" or "very heavy."

For the reasons given above, this court will remand this case for further proceedings. The Secretary should be aware that the ALJ's *sole* factual findings regarding Stetler's past relevant work puts it into the "heavy" category. *See* tr. 36. This court finds those findings fully supported by the record, and *Key v. Sullivan,* 925 F.2d at 1061 permits the claimant to rely on them. The issue on review is whether Stetler *actually* fits into a category which, as performed in the national economy, requires only a medium exertional level. The court thinks it clear that Stetler's past work was a "composite" job. *See* SSR 82–61. Frankly, the court believes that Stetler has rebutted any presumption that could be derived from the DOT that her past work could be considered medium.

### Functional Capacity

Even if Stetler's past relevant work could correctly be characterized as "medium," this court would probably still remand this case. The ALJ's finding that Stetler could perform work at the medium level is seriously flawed. The ALJ's finding is based primarily on what he characterizes as "credibility determinations." This court gives great deference to credibility determinations by an ALJ. *See Steward v. Bowen,* 858 F.2d at 1302. An ALJ's credibility determinations will not be disturbed unless patently wrong. *Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir.1994). The requirements placed on an ALJ under current precedent are quite light. *See Look v. Heckler,* 775 F.2d 192 (7th Cir.1985).

However, in this case the ALJ gave very specific reasons for his belief that the claimant lacked credibility. Those reasons are very seriously flawed, to the extent that the court believes that the record is not developed to the extent required for effective judicial review.

There does seem to be evidence in the record that would support the ALJ's Residual Functional Capacity ("RFC") findings. However, there is at least equal if not greater evidence that would support a lower RFC finding. While the resolution of conflicting evidence is in the bailiwick of the Secretary, the ALJ's reasoning in this case is cause for concern. Because this case is being remanded to the Secretary at Step Four anyway, *see supra,* the court need not make a decision as to Stetler's RFC. However, considering this *record,* some *comments are in order which* the Secretary should consider on remand.

Stetler is offended by the ALJ's disbelief of her subjective claims of pain and impairment. The ALJ found that the claimant's credibility was "poor." *Id.* at 17. The ALJ did not believe Stetler's testimony that she has difficulty walking, falls, or suffers from "foot drop." *Id.* at 19. However, the ALJ never says that his personal impression of the claimant's testimony was that she was lying; rather he attributes his disbelief to a number of external factors. Many of those factors are problematic, if not demonstrably incorrect. Some of those that concern the court will be discussed here.

In support of his finding of low credibility the ALJ stated that he believed the questioning which elicited Stetler's testimony was leading, that the ankle injury had occurred in 1975 and there was no evidence of more recent trauma, and the ALJ believed that the testimony of witness Diaz was "designed" to coincide with an anticipated report from Dr. Lutzenheiser which never materialized. *Id.* at 18–19. The ALJ noted that the evidence showed the claimant had worked steadily from the time of the ankle injury in 1975 to 1991, and the medical evidence in the record showed no loss of strength in the left leg. *Id.* at 19.

The ALJ stated that "within six months of her alleged onset," Dr. Crecilius found that

the claimant's neurological status was normal. Tr. 19. The ALJ makes much of this as it relates to 20 CFR 404.1529(c)(2)(4). Unfortunately, the court can find no such report in the record. The ALJ cites to "Exhibit 23, page 2" (tr. 184), but that exhibit is actually a report from Dr. John Gossard, and more importantly does not state that the claimant's neurological status was normal. The court has searched the record backwards and forwards and can not discern to what report the ALJ is referring.

If the ALJ was speaking of Exhibit 23, page 2 (tr. 184) (report by Dr. Gossard), he clearly mischaracterizes it. First, there are no neurological findings, normal or otherwise. The only neurological comment was that Stetler did not extend her right great toe as well as the left, and it was "difficult to know" whether that was a neurological problem. Tr. 184. The only thing reported as "normal" was an AP pelvis x-ray showing the hip joints and pelvis as normal. *Id.* Of course, only a doctor is qualified to testify as to what "normal" x-rays mean, but even a layman knows that x-rays can tell only a narrow slice of the story. The court doubts (without knowing) whether x-rays can detect nerve damage. Second, the ALJ stated that the "absence of any evidence of motor weakness," particularly in the lower extremities, "directly contradicts" the claimant's testimony that her ankle "gives out." Tr. 19–20. What the report says is that there is "no obvious sensory loss in the lower extremities." Tr. 184. This court can not presume that sensory loss is synonymous with motor weakness. As for the ankle reflexes, the court simply does not know whether "1 + bilaterally" is good or bad.

The only physical capacities evaluations were done by Dr. Gossard. The ALJ dismisses them because Dr. Gossard "was not the claimant's surgeon or principal treating physician" and because Dr. Gossard's relationship with the claimant was not "so intensive or extensive as to warrant deference." Tr. 16. The record does not support this finding. It should be noted that Dr. Gossard was the doctor who performed her ankle surgery in 1976, and saw her throughout the 1970s and 1980s. *See* Tr. 186–89. There are more reports in the record from Dr. Gossard than from any other doctor. Thus, the court thinks it very odd that the ALJ would state that Dr. Gossard lacked an extensive medical relationship with the claimant. The record shows that Dr. Crecilius only did the back surgery because Stetler's regular doctor, Dr. Gossard, was serving in Desert Storm in the Middle East at the time. Tr. 49–50, 53.

The ALJ wishes to discount Dr. Gossard's functional capacity assessments, and so states that his "relationship with the claimant is not so intensive or extensive as to warrant deference to even his inconsistent opinions." Tr. 16. That is simply insupportable. A cursory review of Tr. 183–189, 200, 206, and 231–33 reveal over twenty (20) examinations by Dr. Gossard, reaching back to Stetler's ankle surgery in 1976. At least seven examinations occurred since the claimant's accident, between June 3, 1991 and July 9, 1993.

Furthermore, the ALJ's opinion that Dr. Gossard's evaluations were "inconsistent" and thus not entitled to deference is based on his erroneous impression that the evaluations were performed one month apart, rather than the actual eleven months. The ALJ considers Dr. Gossard's assessments "inconsistent" because the "July 9, 1993" assessment showed Stetler able to lift a maximum of five pounds, and the "August 10, 1993" assessment stated ten pounds. Tr. 16. That would show Stetler in better shape one month after the first evaluation, and would tend to support the ALJ's findings. However, it is not Dr. Gossard who is inconsistent, but rather the ALJ who misread the dates. The assessment that the ALJ says was on "August 10, 1993" was actually dated August 10, *1992* (Tr. 183), which simply indicates that in the course of *eleven* months the claimant's ability to lift *worsened* by five pounds. Hardly inconsistent; more likely a demonstration that Stetler's abilities are failing.

Finally, in regard to the ALJ's lack of deference to Dr. Gossard's opinions, the ALJ says that Dr. Gossard did not see the claimant until one year after her April 1991 accident and surgery. Tr. 16. That is simply inexplicably wrong. The record very clearly shows that Dr. Gossard saw the claimant *twice* in June 1991 (the first time a month

and a half after her surgery), and then again in July 1991. Tr. 184–85. The claimant states that Dr. Crecilius did the surgery instead of Dr. Gossard only because Dr. Gossard was serving in Desert Storm at the time. Given the twenty-year doctor-patient relationship between the claimant and Dr. Gossard, that is certainly not reasonable grounds for the ALJ to say that Dr. Crecilius was this claimant's real doctor rather than Dr. Gossard.

The ALJ's dismissal of Dr. Gossard's physical capacity assessments is unreasonable and not entitled to deference by this court. The two assessments, given one year apart, are substantially the same except that the amount Stetler could lift decreased from ten to five pounds, and the doctor removed two of the restrictions (exposure to marked changes or dust, fumes, and gases). *Compare* Tr. 200 *with* Tr. 231. Dr. Gossard's July 9, 1993 assessment (Tr. 200) is supported by that of Thomas Kerr, given on September 22, 1993. *See* Tr. 236. The ALJ completely ignored (or overlooked) the physical capacities assessment by Kerr; it is not mentioned in his decision. Perhaps that was reasonable; Kerr is not a doctor but an R.N. who worked with Stetler. Tr. 235. Kerr's and Dr. Gossard's assessments are not identical, but are consistent.

The ALJ believed that the claimant's lawyer asked leading questions, suggesting to the claimant what answer she should give. Because of this, the ALJ gave little weight to her testimony. Frankly, carefully reviewing the written hearing transcript, that is an unfair and unwarranted assessment. Some of the questions were slightly leading, but generally just related back to what the claimant had already stated in response to questions by the ALJ. By the time the attorney asked questions of Stetler, the ALJ had already pretty much plumbed the depths. Much of the testimony in response to the attorney's questions was just filling in some details. Apparently, the only question by the attorney acceptable to the ALJ would have been, "Ms. Stetler, would you explain to the ALJ what is wrong with you?" Although, that would probably also be "leading" in the

ALJ's opinion, since it suggests to the claimant that something is wrong with her.

ALJ Norris noted that the claimant was not credible because she claimed to be taking two muscle relaxants simultaneously, and ALJ Norris considered this "highly unlikely." Tr. 20, 11. That is quite a bold (and baseless) medical evaluation coming from someone who, in his letter to Dr. Crecilius, acknowledged that he was a layman without substantial medical knowledge. *See* Tr. 191. The court notes that a cursory examination of the record indisputably shows the claimant to have been taking Talacin, Parafon Forte, Centrax, Prednisone, Anaprox, Elavil (brand name for amitriptyline), Darvocet, Zantac, and Feldene, among other drugs; many simultaneously. *See* Tr. 138, 177, 150, 232.

First, neither the claimant nor the ALJ are medical doctors. If the claimant was taking too much medication or conflicting medications (*see* Tr. 154), that is a matter for her doctors to address. ALJ's can not make their own independent medical determinations. *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985). Whether the ALJ considers it "highly unlikely" or not that the claimant would be taking two "muscle relaxants" at the same time is irrelevant in light of the fact that the medical evidence affirms her testimony as to what she was taking. Second, and more importantly, it was the *ALJ* who suggested to the claimant that Elavil is a "muscle relaxant." Tr. 56. It is not; it is an *antidepressant* with sedative effects, sometimes used to treat anxiety. *Physicians Desk Reference* 2372–74 (1993), *Drug Facts and Comparisons* 1220–27 (1992). She probably was told that it would make her "relax." The claimant was suffering from depression. Tr. 150–51. Parafon Forte was the only muscle relaxant being taken by the claimant, and she appears to have known that (although she is understandably vague about what an "anxiety" drug does—she is not a doctor). *See* Tr. 56. ALJ Norris should not be playing doctor; he should be evaluating the evidence presented to him by medical professionals. For the ALJ to discount Stetler's credibility because he considers it "highly unlikely" that she would be on amitriptyline (Elavil) and Para-

fon Forte at the same time, especially when such claim is supported by the record, is insupportable and is not a determination worthy of deference by this court.

The ALJ also discussed his understanding of Workers' Compensation Law, stating his left-field belief that a favorable decision from him could permit the claimant to reopen her Workers' Compensation claim and get more money. This is so irrelevant that it does not bear discussion. The court notes that I.C. § 22–3–3–27(c), setting a one- or two-year time limit on modification of awards, seems to render the ALJ's "theory" not just irrelevant but also irrational. It was unfair to allow this unsupported suspicion enter into his determination.

The ALJ stated that "[t]he reasonable inference to be drawn from the non-submission of a recent evaluation of the claimant's status is that such an evaluation would not be favorable to the claimant." Tr. 20. The court is not sure what the ALJ means by this. The application for benefits was filed May 20, 1991. The hearing was not held until August 12, 1992, and the ALJ's decision did not come out until January 14, 1994. At the hearing, the claimant submitted a physical capacities evaluation by Dr. Gossard, which was dated *two days* previously (August 10, 1992). Tr. 183. The claimant could have hardly been more recent if she had stopped at the doctor's office on the way to the hearing. Also submitted at the hearing were Dr. Gossard's notes of Stetler's office visits; five between the date of application and the hearing, the last of which was April 29, 1992. Tr. 184–85. After the hearing and before the decision, the ALJ received a letter from Dr. Crecilius dated June 8, 1993 which noted that on March 11, 1992 he saw Stetler and recommended a permanent partial impairment rating of Lumbar 10%. *See* Tr. 209. Also submitted was another physical capacities evaluation by Dr. Gossard dated July 9, 1993 (Tr. 200), and a physical capacities evaluation by Thomas Kerr dated September 22, 1993 (Tr. 236). The claimant's lawyer had asked that the file be kept open, anticipating an evaluation from a new doctor (Dr. Lautzenheiser), but that did not materialize and so the claimant's lawyer on October 15, 1993

asked that the file be closed and a decision rendered. Tr. 234. It can not be said that the medical evidence in this case was not up to date.

However, perhaps the ALJ was referring specifically to the anticipated report of Dr. Lautzenheiser, which never materialized. On August 16, 1993 the claimant's lawyer wrote the ALJ that "[Stetler] was examined by a specialist in Indianapolis," Dr. Lautzenheiser, and that the attorney would forward the report as soon as he received it. Tr. 225. On August 26, 1993, the claimant's attorney again wrote ALJ Norris to say that "[Stetler's] appointment for evaluation of her functional limitations has been postponed by Dr. Lautzenheiser" until August 30, 1993, and the attorney would get the evaluation to the judge as soon as possible. Tr. 229. On October 15, 1993, the attorney again wrote to ALJ Norris, stating that the doctor "was unable to have the physical capacity evaluation completed because of the claimant's pain," and that the file could be closed and a decision rendered. Tr. 234. The ALJ believed it likely that the real reason for the failure to submit Dr. Lautzenheiser's report was that it found no medically determinable abnormalities with the allegedly defective ankle. Tr. 19. Frankly, this court can not disagree. It is especially questionable that there is no letter from Dr. Lautzenheiser himself, only the second- or third-hand statement from the attorney. The ALJ was at least substantially justified in viewing this failure to submit this hyped report as evidence detrimental to Stetler's claims.

The ALJ stated his belief that the claimant's testimony regarding her ankle problems was "a sham and a fraud." Tr. 21. He cites in support to treatment records from Dr. John Gossard (Exhibit 35, page 2), who on April 29, 1992 and again on August 24, 1992 found claimant's left ankle to be "stable." Tr. 232. The ALJ is clearly correct that the claimant's doctors in some respects do not feel she has as much wrong with her as she believes. However, there is also a substantial amount of evidence in support of her claims.

The ALJ's job is to evaluate the medical evidence as it is provided to him, and if there

are any gaps, to require additional evidence. While much of the ALJ's reasoning regarding Stetler's credibility is based on irrational or unsupported opinions, rather than on such things as witness demeanor, there is certainly medical evidence support his RFC finding. The court's problem is with his reliance on irrelevant or faulty reasoning. Perhaps the ALJ was merely trying to shore up his findings, but that just makes this court's review process more difficult.

Letters from people who know her, as well as her long-term chronic complaints make it unlikely that she is trying to effect a "sham" or "fraud" as the ALJ believed. Perhaps some of her problems are physical manifestations of emotional or attitudinal problems. *See* Tr. 216. That is what her doctors seem to think. *See* Tr. 154, 168. However, this is of course almost-baseless speculation, and the court can not base a decision on it.

It is not this court's place to reweigh the ALJ's credibility determinations, but when he gives reasons for such determinations that are irrational or baseless, and have nothing to do with the claimant's demeanor or the evidence, then this court must comment. This case in any event must be remanded because the Step Four determination that Stetler can perform her past work is not supported by substantial evidence. The court mentions its concerns as to Stetler's RFC determination so that the Secretary can more carefully review this case on remand.

### F. Conclusion

The record in this case does not provide substantial evidence to uphold the Secretary's determination that Stetler can perform her past relevant work. However, neither does it provide sufficient evidence for this court to order an award of benefits. There are significant holes to be filled in the record and the reasoning, and questions to be answered. For the reasons stated above, this case is **REMANDED** to the Secretary for further proceedings. **SO ORDERED.**