Clarence E. JONES, Plaintiff,

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 05–G–1134–NW.**

United States District Court, N.D. Alabama, Northwestern Division.

Oct. 5, 2007.

Robert W. Bunch, Bunch & James, Florence, AL, for Plaintiff.

Edward Q. Ragland, U.S. Attorney's Office, Birmingham, AL, Joseph P Palermo, III, Social Security Administration, Office of General Counsel, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

J. FOY GUIN, JR., District Judge.

The plaintiff, Clarence E. Jones, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security Benefits. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth*, at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth*, at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520(a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir.1993); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir.1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope*, at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir.1995).

In the instant case, the ALJ, Randall C. Stout, determined the plaintiff met the first two tests, but concluded he did not suffer from a listed impairment. The ALJ found the plaintiff unable to perform his past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commis-

sioner] to show other work the claimant can do." *Foote*, at 1559. Furthermore, when a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical–Vocational Guidelines (the grids). *Foote*, at 1558–59. The presence of a non-exertional impairment such as pain, also prevents exclusive reliance on the grids. *Foote*, at 1559. In such cases "the [Commissioner] must seek expert vocational testimony". *Foote*, at 1559.

## DISCUSSION

The ALJ found the plaintiff "has a limited education and prior unskilled work." [R 18] The ALJ found the plaintiff's residual functional capacity limited him to light work in a controlled environment. [R 19] In the prehearing order in the present case, the plaintiff listed grid rules 201.09 and 202.9 to support his claim of disability. [R 163] Grid rule 201.9 applies to claimants restricted to sedentary work and provides that an individual closely approaching advanced age (50–54 years old) will be found disabled if his educational level is limited or less and he has no transferable skills from his prior relevant work. Grid rule 202.09 applies to claimants limited to light work and provides that an individual closely approaching advance age will be found disabled if he is illiterate and his previous work was unskilled. At the time of the ALJ hearing decision, the plaintiff was 54 years of age. [R 18] Therefore, because the ALJ found the plaintiff is limited to light work, and that his previous work was unskilled, he would be disabled under Grid Rule 202.09 if he is illiterate. At the plaintiff's ALJ hearing in the current case, the issue of illiteracy was raised by the plaintiff's attorney and there was an extensive

discussion on the record about whether illiteracy had been alleged in the plaintiff's previous application.[1] [R 25–29] In the earlier decision, ALJ Vanderhoef found the plaintiff, who was then 52 years of age, had "a ninth grade education." [R 72] Therefore, the first issue that the court must address is whether ALJ Stout reopened the prior decision of ALJ Vanderhoef as to the issue of whether the plaintiff was illiterate. If ALJ Stout did not reopen the earlier decision, the doctrine of administrative *res judicata* would bar the plaintiff's assertion that he is illiterate in the present case.

■ In this Circuit, "[a] final decision by the [Commissioner] will be deemed reopened if it is 'reconsidered on the merits to any extent and at any administrative level.'" *Cherry v. Heckler*, 760 F.2d 1186, 1189 (11th Cir.1985)(quoting *McGowen v. Harris*, 666 F.2d 60, 65 (4th Cir.1981)). Accordingly, if it is determined that ALJ Stout reopened the prior decision, this court has "jurisdiction to review the prior decision to the extent that is has been reopened." *Wolfe v. Chater*, 86 F.3d 1072, 1079 (11th Cir.1996)("When we determine that an ALJ has reopened a prior decision, we have jurisdiction to review the prior decision to the extent that it has been reopened."). The court in *Wolfe* observed that "this court has suggested that the [Commissioner's] final decision will be deemed reopened if the ALJ does not apply *res judicata* and bases an ultimate determination on a review of the record in the prior application." *Id.* at 1079 (citing *Cherry*, 760 F.2d at 1189).

In the present case, ALJ Stout did not apply *res judicata* on the issue of whether the plaintiff was illiterate. At the hearing, ALJ Stout asked whether the plaintiff dis-

---

1. The plaintiff had filed several applications prior to the one currently at issue. The most recent of these claims was denied by ALJ Vanderhoef in a hearing decision dated July 22, 2002. [R 71–78]

agreed with any of ALJ Vanderhoef's findings:

ALJ: So, and so what I was going to reference, anything before Judge Vanderhoof [sic] in his decision I was basically just going to incorporate by reference unless you disagree with any of his earlier findings there so—

ATTY: Well, the only earlier finding, and I'd like to bring out some things that evidently were not brought out because I don't believe I remember seeing them, is that not only his lack of good educational background, I believe he failed the first grade and did have some special education, but also the fact that, you know, this man does not have a driver's license and the reason why he does not is that, you know, he failed the driver's test. There is some question about whether or not he is illiterate and it may not have an effect on this case.

[R 25–26] This exchange took place at the very outset of the hearing and led to extensive discussion about whether the plaintiff had alleged illiteracy in the prior clam heard by ALJ Vanderhoef:

ALJ: The prior decision on page 2 of that, basically I'll just read what's in there. The claimant who is 52 years old, has a ninth grade education and past work experience as a highway maintenance worker, so I believe the prior decision basically went on ninth grade education.

ATTY: Well—

ALJ: So let me look at the findings and see if we made a—I don't know if

anybody even argued illiteracy or not. . . . .

[R 26]

A review of the transcript of the hearing before ALJ Vanderhoef clearly shows that the plaintiff alleged he was illiterate at the earlier hearing. He testified that even though he finished the 9th grade, he had taken special education classes:

ATTY: How far did you go in school, Mr. Jones.

CLMT: 10th.

ATTY: Did you finish the 10th or was it the 9th? You stopped in the 9th?

CLMT: Well, I passed to the 10th and I didn't go back.

 \* \* \* \* \* \*

ATTY: Were you in any type of special education or a regular class?

CLMT: To what? Like [INAUDIBLE]?

ATTY: No, in the school curriculum. Were you in the regular class or were you taking special education class.

CLMT: Yes, special education class.

[R 261] When ALJ Vanderhoef asked him whether he wore glasses, the plaintiff's testimony removes all doubt about whether he claimed to be illiterate at his previous hearing:

ALJ: . . . . You wear glasses?

CLMT: No, sir.

ALJ: You don't need glasses to read with?

CLMT: I can't read, Your Honor.

ALJ: You can't read or write?

CLMT: I can write, you know. Some things I can read, some things I can't, you know.

ALJ: How did you get to the 9th grade and not be able to read?

CLMT: I just, I made it.

ALJ: You made it. Where did you go to school?

CLMT: [Leighton] Training School.[2]

ALJ: Well what did they train you to do at [Leighton] Training School other than not read?

[R 265] ALJ Vanderhoef also asked the plaintiff whether, in his previous job, he had "to read any blueprints or anything of that sort." [R 266] The plaintiff responded that he did not. [R 266]

The above illustrates that the question of whether the plaintiff was illiterate was at issue in the prior hearing. It also illustrates the generally hostile treatment the plaintiff received at the hands of ALJ Vanderhoef. The following are other transcript excerpts that illustrate ALJ Vanderhoef's hostility toward the plaintiff:

ALJ: And you can't work because you can't see, but you watch television all day long. Try and explain that to me.

CLMT: Well, I can see the TV and everything, you know, but it's just—

ALJ: All right.

CLMT:—when you try to hold things up, try to ready [sic] something you know, it hurting my eyes.

ALJ: I didn't think you could read.

CLMT: Huh?

ALJ: I didn't think you could read.

CLMT: I can't, but I say if you hold things up trying to read things, I can't see no way cause my

eyes is bad on me. TV is a big picture.

\* \* \* \* \* \*

ALJ: You have a driver's license?

CLMT: No, sir.

ALJ: Why not?

CLMT: Just ain't get none.

ALJ: Have you ever had one?

CLMT: No, sir.

ALJ: And you drive back and forth to work and things of that sort?

CLMT: Well, I did, but, you know,—

ALJ: Why would you want to drive without a driver's license?

CLMT: After I got caught I stopped driving.

ALJ: You got caught for what?

CLMT: Driving back and forth to work and stuff. So I had a friend come by and pick me up. I started [to] ride with them to work.

ALJ: So you drive for many years without a driver's license. You're just to [sic], to [sic] trifling to get a driver's license or what?

CLMT: No, I wasn't too trifling, you know, I just, you know, and I didn't go get em.

ALJ: Well, you don't think the driver's license law in Alabama applies to you?

CLMT: Oh, yeah. Yes, sir. It's just, you know, like you said I should have got one now.

[R 266–68]

ALJ: Okay. You're not having a driver, have you ever had a driver's license in your life?

---

**2.** Leighton Training School was a segregated African–American school in Colbert County, Alabama. [R 34]

CLMT: No, sir.

ALJ: Okay, But you have been arrested for driving while intoxicated. Right?

CLMT: Yep.

ALJ: How many times?

CLMT: About three or four.

ALJ: Three or four times you been arrested for DUI?

CLMT: Yeah, but it's been years ago. Years ago.

ALJ: Oh, you're kind of a slow learner, aren't you, Mr. Jones? I mean you're [sic] been arrested three or four times which apparently you don't care about other people out on the highway if you're going to drink and drive and that sort of thing.

CLMT: Well, let, let me—

ALJ: Second of all, you don't care about yourself because you're smoking you're smoking and then you're complaining about having a shortness of breath.

CLMT: Yeah, but I had to learn though. I learned.

ALJ: You did it the hard way.

CLMT: Yeah.

ALJ: Did you ever do any time for driving while intoxicated?

CLMT: Well, I, yeah, no, just in jail or stuff, yeah.

ALJ: How much? Not near as much as you should have if you've been arrested four time [sic].

CLMT: Well, you know I paid my fine off and everything, but I, you know.

ALJ: Well, now you should have gone to the penitentiary.

[R 269–70] ALJ Vanderhoef's questioning of the plaintiff about his drinking history also shows that the plaintiff had difficulty understanding the ALJ's questions:

ALJ: How much are you drinking now?

CLMT: I don't drink nothing now?

ALJ: When did that stop?

CLMT: A little while.

ALJ: Well, I mean yesterday was a while ago.

CLMT: I know yesterday was a while ago.

ALJ: All right. You say you're—

[R 271] At this point, the plaintiff's attorney attempted to help the plaintiff understand the question he was being asked:

ATTY: When you stopped drinking.

CLMT: Oh. Oh. About three years ago, I guess. Somewhere around there.

ALJ: Is that right after you got arrested for driving while intoxicated?

CLMT: No, I quit before then, after then, way before then.

ALJ: You got, you quit drinking before you got arrested for driving while intoxicated?

CLMT: After then. After then.

[R 271] During other questioning, the plaintiff appeared not to understand what "compensation" or "malingering" meant. [R 272, 274]

ALJ Vanderhoef's hostile attitude can clearly be seen in the following question:

ALJ: You just watch television and sometimes you go walk around the house, you get winded and then you go out on the front porch and—

CLMT: No, I said I walk around the block sometimes.

ALJ:—sit down and smoke cigarettes and—

CLMT: Well, sometimes I don't—

ALJ:—complain about your eye sight when it's 20/20.[3]

[R 277]

While the plaintiff appears to be less than a model citizen, the question facing ALJ Vanderhoef was whether he was disabled or not. The question of whether the plaintiff was illiterate was crucial to that determination because of the plaintiff's age—52 years old at the time of ALJ Vanderhoef's decision. The record shows that ALJ Vanderhoef gave little consideration to the question and he found the plaintiff had a "limited education."[4] [R 78] In spite of contradictory evidence, ALJ Vanderhoef used the highest numerical grade plaintiff completed in determining his educational level. In ALJ Vanderhoef's decision, there is an account of a report by the Commissioner's consultative mental examiner, Dr. Atkinson. ALJ Vanderhoef's summary of Dr. Atkinson's report contains the following: "Dr. Atkinson

found that the claimant malingered [on IQ testing] and stated that both alcohol abuse and a learning disability should be ruled out. *She noted that the claimant was illiterate* . . . ." [R 73 (emphasis added).] Dr. Atkinson's report standing alone should have caused ALJ Vanderhoef to consider whether the plaintiff was illiterate in spite of having nominally finished the ninth grade. However, ALJ Vanderhoef made no effort in his decision to resolve this statement by the Commissioner's consultant, with his finding that the plaintiff had a limited education.

A review of the hearing before ALJ Stout shows that he reconsidered on the merits ALJ Vanderhoef's findings concerning the plaintiff's educational level:

ALJ: Have we got school records?

ATTY: Well, that's the reason I was asking about 4E.[5] There is supposed, you know, Judge Vanderhoef [sic] in his decision re-

---

3. ALJ Vanderhoef's decision refers to conflicting vision assessments. A 1999 Health Department screening apparently showed the plaintiff had 20/20 vision. [R 75] However, a 2001 consultative examiner's funduscopic examination "revealed some diabetic retinopathy with some AV nicking and some hemorrhages," and his visual acuity was assessed at 20/50 bilaterally. [R 75] Although ALJ Vanderhoef's determination as to the plaintiff's visual acuity is not subject to review by this court, his statements at the hearing appear to show that he had made up his mind prior to hearing not to credit the testimony of the plaintiff and his wife concerning his vision problems.

4. The Commissioner's regulations define "limited education" as follows:

Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through 11th grade level of formal education is limited education.

20 C.F.R. § 404.1564(b)(3). However, the Commissioner recognizes that one's numerical grade level is not always determinative of a claimant's educational abilities:

Formal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of you formal education, may no longer be useful or meaningful in terms of you ability to work. Therefore, the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities.

20 C.F.R. § 404.1564(b).

5. Exhibit 4–E is listed in the index of exhibits before ALJ Vanderhoef as "School Records (completed by teacher and/or other non-medical personnel)." [R 81] The exhibit is not part of the current record. ALJ Vanderhoef *did not discuss or cite the exhibit in his written decision to support his finding as to the plaintiff's educational level.*

fers, you know, when you list all the exhibits he's referring to 4E, but you know, my, who I sent over here to copy them evidently couldn't find them because they're supposed to copy that and it was not a part of my file so—

ALJ: Okay. His, I'm just going back to Judge Vanderhoof's [sic] notes and what we have in there is education. It says tenth, passed to the tenth but never went and he finished the ninth grade. And there's a note about that he did attend special education classes and went to Leighton (Phonetic) Training School and let me see if there are any notes about whether there were any allegations about that he was not able to read, write and perform ordinary math.

\* \* \* \* \* \*

ATTY: . . . . I'm saying that even at light he grids if he's illiterate.

ALJ: Okay. But what shows that? I mean do we have anything other than—

ATTY: Well—

ALJ: —in testimony though, I mean.

\* \* \* \* \* \*

ALJ: All right. Well, like I said, at the prior hearing all the available notes I had from the individuals at the hearing, including Judge Vanderhoof [sic], apparently there were no allegations made at the hearing in that regard so—

ATTY: Well, I don't know why not. It looked to me like it's all over this application, but—

ALJ: Has he alleged it in the record, I mean in any submissions to Social Security?

ATTY: I think that all the, well, alleged is probably too harsh a word. He's had to have help with, you know, the application. He doesn't, let me just look here.

ALJ: Yeah. In one of the exhibits he said he doesn't read well, so I don't know what doesn't read well is so that's not really defined whether he's able to read at all or just doesn't read well. You know, it's kind of a nebulous thing.

ATTY: I may need to have him tested for that to see if that test will come back valid.

ALJ: Okay. Well, you need to remind him though, you know, to, any testing he needs to give his best effort so—

ATTY: Well—

ALJ: That was a—

ATTY: —he could not complete the form because he had

ALJ: —that was an issue previously.

ATTY: —to get his sister, Rosie Abernathy, to complete it for him.

\* \* \* \* \* \*

ALJ: . . . . I do have a form from the claimant in the record where they asked him a specific question, can you read English, and it's checked yes. So like I say, the issue is he's apparently stated twice that he's able to read English but not, that he's able to read but not very well.

CLMT: I can't read at all. I might understand some things and sometime I can't. I cant' read. I have to get somebody to fill

my forms out and stuff for me. I can't understand that.

\* \* \* \* \* \*

ALJ: Are you able to read? Say if somebody gives you a list and let's say I gave you a list and I wanted you to buy some toothpaste, some toilet paper and some candy—

CLMT: Well, I can understand—

ALJ:—would you be able to read that?

CLMT: I can understand that, you know this toilet paper here and this and that, I can understand that, you know.

ATTY: Your Honor, in the initial contact form it says he can't read, low education.

ALJ: Okay. Well, I've got, the one that he, or somebody checked, is a form that he, or somebody filled out for him on January 6, 2002, it's in B5–E and states can you read English and it's checked yes.

ATTY: Well—

ALJ: And—

ATTY:—I mean that could mean he could read his name. You Honor, I mean, you know.

ALJ: I mean but then it said can you write more than your name in English, yes.

ATTY: Well—

ALJ: So I mean the issue is how much more can you read.

ATTY: But the initial, I mean I just don't want you to think we're making this up right now, Your Honor. the initial claimant contact form says, you know, can't read, low education, and it's evident. I mean it's clear it's not his writing.

ALJ: Well, at the base though we have a conflict that he or somebody alleged that he is able to read English and, yes, he's able to write more than his name. But the issue is how much more.

\* \* \* \* \* \*

ALJ: Okay. Yeah. I mean I've just got innuendos. I've got one that says he got some ... prescription reading glasses. And I'm not sure when people say, you know, reading glasses, that could mean to read or just to do, handle something that's close you know. So we've got, that's not, doesn't establish anything one way or the other. Let's leave that issue kind of up in the air.....

[R 26–32]

The plaintiff was asked about his school years by his attorney:

ATTY: And when you were in school did they put you in any, I'll just call them special classes.

CLMT: Yes, sir.

ATTY: What type of special classes did they put you in?

CLMT: Where you can't read and they help you read things.

ATTY: Okay. Did you have trouble also with math or spelling?

CLMT: I was slow in everything.

ATTY: When you were in school what type of grades did you make?

CLMT: I had bad grades. I didn't have no good grades. Most of the time they passed me. They just didn't want to be bothered with me, you know, because they going to get me up out of there.

\* \* \* \* \* \*

ATTY: They told you you were slow?

CLMT: Yeah. I can't read really. That's for real.

ATTY: When did you take your first driver's test?

CLMT: I guess I was about 16, I think, when I quit school.

ATTY: . . . . Were you able to pass it?

CLMT: No, Sir.

ATTY: Did you ever try to go back and take it again?

CLMT: No, sir.

ATTY: Did they make you take the reading test or the oral test when you took it, if you remember?

CLMT: The reading test.

ATTY: The reading test?

CLMT: Yes, sir.

ATTY: Did you ever try to go back and just take the oral test to get a license?

CLMT: No, sir.

 ALJ Stout questioned the plaintiff about his testimony at his previous hearing about not getting a driver's license:

ALJ: Mr. Bunch [the plaintiff's attorney], in his prior hearing claimant testified that he did drive, but never had a driver's license, and he testified at that time that he just never went to get his license.

CLMT: I went one time. I flunked.

ALJ: Well, the reason I'm asking is you told Judge Vanderhoof [sic] earlier that you never even went to get a license?

CLMT: I told him. He just have didn't hear me or nothing, but one time this year failed so [sic]—

[R 39] The plaintiff's attorney continued to question the plaintiff about his inability to read:

ATTY: When you applied for Social Security on this occasion or on the last occasion, did you fill out the forms or did you have to get somebody to help you?

CLMT: I had to get somebody to help me.

\* \* \* \* \* \*

ATTY: . . . [W]ho would fill out the paperwork for taxes and things of that nature?

CLMT: I can't. Something like H & R Block or somebody like them would fill them out either. I can't, the Pawn Shop or whatever, me and my wife.

ATTY: Why didn't you fill out your taxes?

CLMT: I can't read. . . . .

ATTY: Well, when you'd go and try to get different jobs who would fill out the job applications?

CLMT: Well, somebody be with me. I get the application. They tell me I can bring it back. I carry it home and my sister or somebody, they fill it out for me.

ATTY: Can you write your name?

CLMT: I can write my name, but it's always, it's all printed.

ATTY: Can you make out a list to go to the store and maybe pick up some things?

CLMT: No, because I wouldn't know how to spell.

ATTY: Has your wife made you out a list and told you to go pick up some things for her?

CLMT: No. No more than like she would say go get some toilet paper, washing powder or some sugar. I can remember that.

RE–EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

ALJ: Are you able to read it though?

CLMT: No, I don't know about no reading.

ALJ: If I hand you a list, you know, with that on it.

CLMT: I doubt it.

ALJ: Could you read it. I mean we're asking not if yo [sic] doubt if you could reads [sic] it, or are you able to read street signs, signs that say, you know, Muscle Show [sic] is 12 miles or something like that?

CLMT: No, unless I'm in the car with somebody and say we got muscle show [sic] here and I would remember that place and go back. I say, yeah, I remember because the sign said muscle show [sic]. They'd tell me about it. But going somewhere that, you know, the sign says something then I won't know.....

[R 39–41]

ATTY: ....Are you able to read the bottles [of insulin] or are you recognizing the bottles because one is purple and one is orange.

CLMT: Yeah, just like you said, yeah. I can't read the bottles, you know. Like they tell me what you're supposed to take this orange, a certain kind of whatever. Then I got it marked down because it says 15, put 15 orange. It might say 20 of this here purple so I have to do it that way.

[R 54–55]

Statements by ALJ Stout near the end of the hearing make it clear the plaintiff's allegations of illiteracy were a question yet to be determined. After the plaintiff's attorney suggested the plaintiff would meet grid rule 202.09 if he were illiterate, the ALJ responded: "But we aren't there yet.

.... I mean *that's one of the things that's kind of up in the air.*" [R 57 (emphasis added).]

ALJ Stout's written decision removes any doubt as to whether he was applying *res judicata* on the question of the plaintiff's allegations of illiteracy. ALJ Stout cited evidence from his current application to discredit the plaintiff's claim of illiteracy:

The claimant's credibility is further reduced given his inconsistencies regarding his smoking and allegations of illiteracy. In a Report of Contact at Exhibit B–1E, the claimant asserts he cannot read well due to his low education, as opposed to not being able to read or write at all. Also in a prior decision illiteracy was not alleged. Furthermore, despite his purported literacy problems, the claimant managed to complete and sign a Physical Activities Questionnaire at Exhibit B–2E dated February 5, 2003.

[R 17] Had ALJ Stout applied administrative *res judicata* to the issue of the plaintiff's educational level, he would have so stated. To the contrary, ALJ Stout cited evidence from his current application to support his finding that the plaintiff was not illiterate. Therefore, ALJ Stout reopened ALJ Vanderhoef's decision on the issue of illiteracy because he "reconsidered [that issue] on the merits...." *Cherry,* 760 F.2d at 1189. This court, therefore, must examine ALJ Stout's finding that the plaintiff was not illiterate to determine if it is supported by substantial evidence.

The only direct evidence recited by ALJ Stout to support his finding that the plaintiff was not illiterate were two reports, Exhibit B–1E and B–2E. A review of Exhibit B–1E shows that the claimant was in fact alleging that he was not able to read. In that exhibit, a Disability Specialist made the following note: "During ICC [Initial Claimant Contact] *claimant ad-*

*vised that he can't read due to his low education* (9th Grade)." [R 121 (emphasis added).] Later in the note, the Disability Specialist refers to an activities of daily living (ADL) form and states: "This form was completed by the claimant's sister (3rd party)." [R 121] The note does state that the plaintiff's sister advised the plaintiff "can't read well due to low education, [and] has never had a driver's license. . . ." [R 121] On the Initial Claimant Contact Form, the Disability Specialist wrote the following under "Additional Information": "Can't read—low ed." [R 123] It is on a report of 3rd party contact form where the Disability Specialist noted the plaintiff's sister stated the plaintiff "Can't read well due to low education." [R 122] Therefore, contrary to the ALJ's assertion, it was the claimant's sister who indicated he "can't read well due to low education."

The other form referred to by ALJ Stout was the Physical Activities of Daily Living Questionnaire, which is Exhibit B–2E. [R 125–130] ALJ Stout asserts the plaintiff completed this form. However, a review of the form shows that the handwriting in the body of the form matches that found on Exhibit B–3E. [R 131–135] It is also evident that the plaintiff's signature does not match the handwriting in the body of the form. On Exhibit B–3E the plaintiff indicated he needed help from his sister in order to complete the form. [R 135]

■ When the administrative record is examined as a whole, it is clear the plaintiff continuously alleged he was illiterate. On Exhibit B–3E, the plaintiff responded "no" to the question: "Do you read?" [R 132] On B–5E, a Disability Report form, the plaintiff answered "no" to the following questions: "Can you read English?" and "Can you write more than your name in English?" [R 138] Later in that form, the plaintiff responded to a question about his schooling: "I went to a special class for

slow learners." [R 143] In these portions of B–5E the answers were typewritten. It was signed by the plaintiff on January 10, 2003. [R 144] A later section of Exhibit B–5E is a similar form filled out by hand. On that form, checkmarks indicate "yes" to the questions: "Can you read English?" and "Can you write more than your name in English?" [R 145] This portion of the form also indicates via a checkmark that the plaintiff did not attend special education classes. [R 152] However, the handwriting does not match the plaintiff's signature, and the syntax of the responses clearly indicate the form was filled in by a third party. For example: "*He* sick all of the time." And: "[D]idn't have any job for *him* because of *his* condition." [R 146 (emphasis added).] ALJ Stout referred to this form at the hearing, and frankly referred to it as a form "that he, or somebody filled out for him. . . ." [R 31] ALJ Stout did not refer to this form in his decision to support his finding the plaintiff was not illiterate, presumably because he believed it was not completed by the plaintiff.

Exhibit B–6E is a field office Disability Report completed by a Social Security employee. On that form, the Social Security employee noted the plaintiff had difficulty reading and answering based on his observations during a teleclaim with the plaintiff. [R 156] In describing his observations, the employee stated:

> Claimant could not remember names of his doctors or medications. He claims two more medical sources, but could only tell me "they were in Muscle Shoals". CLMT's son had to spell the names off of medical bills to get the names I have. *It appears CLMT cannot read or write.* He was otherwise cooperative and pleasant.

[R 156 (emphasis added).]

When all of these forms and reports are considered as a whole, they do not provide

substantial evidence to support a finding the plaintiff is not illiterate. The only portions of the forms tending to support a finding the plaintiff is not totally illiterate were obviously completed by someone other than the plaintiff.

Likewise, the medical evidence does not support ALJ Stout's finding that the plaintiff is literate. Dr. Gillis, one of the Commissioner's consultative examiners included as one of his diagnoses "illiterate." [R 218] The medical evidence presented at the plaintiff's hearing before ALJ Vanderhoef is not part of the record. However, ALJ Vanderhoef summarized the report of Dr. Atkinson, one of the Commissioner's consultative mental examiners. That summary follows:

> Dr. Atkinson saw the claimant in March 1999 when Wechsler Adult Intelligence Scale, Third Edition, testing revealed a verbal IQ of 56, performance IQ of 62, and a full scale IQ of 54. However, Dr. Atkinson found that "considering all tests, behavior, and conditions, these results could not be considered a reliable and valid estimate of" the claimant's cognitive ability. She stated the claimant appeared to try not to do well, and that "his pattern of successes and failures did not seem like that of one with mental retardation." Dr. Atkinson further noted that the claimant "has exhibited job competence and had good memory skills quite unlike one with such a low IQ score."
>
> Dr. Atkinson found that the claimant malingered and stated that both alcohol abuse and a learning disability should be ruled out. *She noted that the claimant was illiterate* and found a global assessment of functioning of 70. She stated that the claimant "is not mentally ill or mentally retarded."

[R 73 (emphasis added).]

Two of the Commissioner's consulting examiners believed the plaintiff was illiter-ate. There is no evidence in any of the other medical records that suggests the plaintiff is not illiterate. Therefore, there is no substantial medical evidence to support the finding the plaintiff has a limited education.

ALJ Stout listed inconsistent statements by the plaintiff about failing his driver's license examination as one of the reasons for not crediting the plaintiff's allegations of disabling symptoms: "Claimant's credibility is further lacking given that he testified in the current hearing that he failed the driver's exam. However in the previous hearing, the claimant, under oath, *stated he never went.*" [R 17 (emphasis added).] ALJ Stout was apparently relying on ALJ Vanderhoef's statement in his decision: "He said *he just never went to get his license.*" [R 74 (emphasis added).] This conclusion is reinforced by ALJ Stout's statement at the hearing that "he testified at that time that *he just never went to get his license.*" [R 38 (emphasis added).] The emphasized language is identical to that used by ALJ Vanderhoef in his decision. However, the transcript of the hearing before ALJ Vanderhoef shows the plaintiff's testimony was not that he "never went to get his license."

> You have a driver's license?
>
> CLMT: No, sir.
>
> ALJ: Why not?
>
> CLMT: *Just ain't get none.*
>
> \* \* \* \* \* \*
>
> ALJ: So you drive for many years without a driver's license. You're just to [sic], to [sic] trifling to get a driver's license or what?
>
> CLMT: No, I wasn't too trifling, you know, I just, you know, and *I didn't go get em.*
>
> ALJ: Well, you don't think the driver's license law in Alabama applies to you?

CLMT: Oh, yeah. Yes, sir. It's just, you know, like you said *I should have got one now.*

[R 266–68 (emphasis added).] The plaintiff's first answer, that he "[j]ust ain't get none," is consistent with not getting a driver's license because he failed the examination. Likewise, his later responses ("I didn't go get em," and "I should have got one") could mean that he never went back after failing the examination. The plaintiff simply did not testify that he "never went to get his license." Nor did he testify that he never took the driver's license examination.

It is unfair in any event to discredit the plaintiff for this perceived inconsistency in his testimony at the two hearings. To the plaintiff at his first ALJ hearing, whether he took the examination and failed, or never took it at all, would not seem to be an important distinction. The plaintiff should not be discredited because of his testimony about events 35 years prior to his ALJ hearings. This is especially true for a claimant who failed the first grade, was in special education classes and only completed the ninth grade. The medical records contains numerous references to the plaintiff being a poor historian.[6] ALJ Stout, who is presumably both highly educated and of above average intelligence, appears unable to understand that the plaintiff is neither. A reasonable fact finder would not have discredited the plaintiff based upon at worst ambiguous testimony about whether the plaintiff took the drivers' license examination 35 years previously.

## CONCLUSION

ALJ Stout reopened the decision of ALJ Vanderhoef as to the issue of the plaintiff's educational level because he reconsidered that issue on the merits. Accordingly, this court has jurisdiction to review the decision of ALJ Vanderhoef on that issue. *Wolfe*, 86 F.3d at 1079. ALJ Vanderhoef gave no reason in his decision for finding the plaintiff was not illiterate. None of the reasons given by ALJ Stout for finding the plaintiff was not illiterate are supported by substantial evidence. In fact, the only medical evidence of record supports a finding the plaintiff is illiterate. In short, there is not substantial evidence in the record to support a finding other than that the plaintiff is illiterate. Based upon the finding by both ALJ Vanderhoef and ALJ Stout that the plaintiff is limited to light work, the plaintiff has been disabled under Grid Rule 202.09 since his fiftieth birthday.[7] Accordingly, the action will be remanded with instructions that the plaintiff be awarded benefits as of that date.

DONE and ORDERED.

## FINAL ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

---

6. *Eg.* Dr. Gillis: "He does not know the names of the medications he is taking." [R 215] "He states that there was some problem that was found with the left eye, but doesn't remember exactly what the doctor told him." [R 216] "[P]atient does not appear to have a good understanding of his health history." [R 217] Dr. Ahmed: "Patient is a difficult historian." [R 177]

7. Although the plaintiff is disabled based upon a residual functional capacity for light work, this court in no way suggests that sub-stantial evidence supports the ALJ's finding on that issue. There is a great deal of evidence, including opinions form the plaintiff's treating doctor, that suggests the plaintiff is limited to sedentary work. In that event, the plaintiff would be disabled even with a limited education under Grid Rule 201.09. Because of the necessity to consider whether ALJ Stout reopened the prior decision as to the plaintiff's educational level, the court has decided the case solely on the issue of illiteracy.

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of the Social Security Administration is hereby REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be awarded the benefits claimed as of the date plaintiff became 50 years old. It is

FURTHER ORDERED that the Commissioner withhold from payments that are determined to be due the plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fee to be allowed plaintiff's counsel for services rendered in representing plaintiff in this cause.

It is further ORDERED pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby granted an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*

DONE and ORDERED.